[No. A055707. First Dist., Div. Four. Dec. 4, 1992.]

BRUCE OBERLANDER et al., Plaintiffs and Appellants, v.
COUNTY OF CONTRA COSTA et al., Defendants and Appellants.

■■■■■■■■■■■■

COUNSEL

Ralph Murphy, Philip J. Bertenthal and Jodie Berger for Plaintiffs and Appellants.

Victor J. Westman, County Counsel, and Arthur W. Walenta, Assistant County Counsel, for Defendants and Appellants.

OPINION

POCHÉ, J.—This case comes before us on appeal by both parties from a judgment granting in part and denying in part a petition for a writ of mandate and from a postjudgment order enforcing that writ. Plaintiffs are a group of individuals who receive general assistance from defendant Contra Costa County (county).

The issues before us are related to provisions of the Welfare and Institutions Code governing permissible standards of general assistance aid which a county may establish. As the issues were originally framed we were required to decide whether the county could reduce aid to general assistance recipients sharing housing with nonrelated individuals and still comply with Welfare and Institutions Code section 17000.5.[1] We rendered an opinion on September 1, 1992, but some 15 days later and before we lost jurisdiction, the Legislature enacted urgency legislation which has changed the statutory scheme by amending section 17000.5 and adding section 17001.5. (Assem. Bill No. 1012 (1991-1992 Reg. Sess.) §§ 13, 14, 17.) After granting rehearing we now address the case in light of those legislative changes.

We have granted rehearing because, although this case is an appeal from the grant of a writ of mandamus, the trial court effectively granted injunctive relief. ■■■ Appeals of injunctions are governed by the law in effect at the time the appellate court renders its opinion. (*Tulare Dist.* v. *Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489, 529 [45 P.2d 972].) The rationale of this rule is that it would be an idle act for this court to determine what the county must do in the future under the law as it used to be but no longer is.

BACKGROUND

The duty to relieve and support the indigent and disabled is one imposed by the state upon each county. (§ 17000.) To that end the county board of

---

[1]Unless otherwise noted, all subsequent statutory references are to the Welfare and Institutions Code.

supervisors is directed to adopt standards of aid and care. (§ 17001.) Consistent with those standards of aid the county then administers its program of general assistance. ■ The counties have broad discretion to set eligibility standards for, and conditions upon, their general assistance aid. (*Clay* v. *Tryk* (1986) 177 Cal.App.3d 119, 124 [222 Cal.Rptr. 729].) However, " ' "[i]n administering general assistance relief the county acts as an agent of the state. [Citation.] ■ When a statute confers upon a state agency the authority to adopt regulations to implement, interpret, make specific or otherwise carry out its provisions, the agency's regulations must be consistent, not in conflict with the statute, and reasonably necessary to effectuate its purpose. [Citation.]" ' ". (*Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 211 [211 Cal.Rptr. 398, 695 P.2d 695], quoting *Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 679 [94 Cal.Rptr. 279, 483 P.2d 1231].)

In 1991 the Legislature enacted section 17000.5 which took effect June 30 and provides in pertinent part: "(a) The board of supervisors in any county may adopt a general assistance standard of aid that is 62 percent of a guideline that is equal to the 1991 federal official poverty line and may annually adjust that guideline in an amount equal to any adjustment provided under Chapter 2 (commencing with Section 11200) of Part 3 [Aid to Families with Dependent Children (AFDC)] for establishing a maximum aid level in the county. [¶] (b) The adoption of a standard of aid pursuant to this section shall constitute a sufficient standard of aid. [¶] (d) For purposes of this section, 'federal official poverty line' means the same as it is defined in subsection (2) of Section 9902 of Title 42 of the United States Code."[2]

The official poverty guideline for 1991 was set at varying dollar amounts based upon the size of the family unit. Thus for a family of one the figure was set at $6,620, for a family of two $8,880, for a family of three $11,140 and so forth. (U.S. Dept. of Health and Human Services (HHS) Annual Update of the HHS Poverty Income Guidelines, 56 Fed.Reg. 6859 (Feb. 20, 1991).)

In response to the enactment of section 17000.5, the Contra Costa County Board of Supervisors adopted Resolution No. 91/606 on September 17, 1991, setting "standards of aid that are 62 percent of the 1991 federal official poverty guidelines." Paralleling the federal use of scaled aid for a family unit, the county adopted a scale of aid for "budget unit" which it defined "as one or more persons residing in a single housing unit, whether or not all such persons are related and whether or not all such persons are eligible for

---

[2]"The term 'poverty line' means the official poverty line defined by the Office of Management and Budget based on Bureau of the Census data." (42 U.S.C. § 9902(2).)

general assistance.[3] *The standard of general assistance aid for each person in a budget unit exceeding 1 shall be an amount equal to the multiple person budget unit standard divided by the number of persons in the budget unit.*"[4]

The standard of aid for homeless individuals eligible for general assistance was set at a one-person budget unit. However, if the homeless person was residing at a public or private shelter, he or she was credited with $10 per day income for the value of the food and shelter received. A homeless person who refused to stay in a shelter or who was ejected by a shelter because of his or her failure to observe shelter rules was also to be credited with income of $10 per day.

By Resolution No. 91/607, also adopted on September 17, 1991, the board adopted what it characterized as a discretionary program for meeting the special needs of those eligible for general assistance. Special need allowances were provided for costs incident to a job search or to taking a job (union dues or uniforms), costs caused by health problems (special diets, eyeglasses, etc.), costs for clothing and a supplement for individuals living in board and care homes.

Plaintiffs filed a complaint seeking injunctive and declaratory relief and a writ of mandate. The superior court elected to grant relief by writ after

---

[3]The county had previously defined budget unit as "the GA applicant or recipient and those household members who are legally or financially responsible for him or her." (Res. No. 89/598.)

Because the method of computing benefits changed so dramatically, comparisons present major apples-and-oranges problems. A sense of the change can be had by comparing the 1991 grant to two general assistance recipients living together to the changed standard of aid proposed for November 1, 1991. After February 1, 1991, two persons "mutually responsible" —that is legally or financially responsible for one another—were eligible for a maximum grant of $566. (Res. No. 89/598; action Jan. 22, 1991.) Under the November 1, 1991, proposed standard of aid, two persons, sharing housing and regardless of their legal or financial responsibility for one another, would be eligible for a grant of $460. (Res. No. 91/606.)

[4]"The monthly standards of general assistance aid per budget unit are:

| Size of Budget Unit | Standard of Aid | |
|---|---|---|
| | Budget Unit | Person |
| "1 | $342 | $342 |
| "2 | $460 | $230 |
| "3 | $575 | $192 |
| "4 | $693 | $173 |
| "5 | $809 | $162 |
| "6 | $926 | $154 |
| "7 | $1043 | $149 |
| "8 | $1159 | $145 |
| "Each additional person add: | $117 | $117" |

concluding that the county had exceeded the authority granted by section 17000.5 by adopting the definition of a budget unit "which will result in drastic cuts where two or more unrelated persons live in the same housing unit." Likewise, it found that the reduction of $10 per day for in-kind benefits received by shelter residents, or those who refuse or are ejected from shelter living, was "not facially permitted" by the statute. The superior court concluded that such changes could not be adopted without a study showing that, despite such reductions, general assistance aid would still provide minimum subsistence needs. (*Boehm* v. *Superior Court* (1986) 178 Cal.App.3d 494, 502 [233 Cal.Rptr. 716].) Defendants appeal from these portions of the judgment and from the order of enforcement.

The superior court, however, rejected plaintiffs' contention that a standard of aid equivalent to 62 percent of the poverty guideline did not also put a cap on the county's liability for special needs or emergency grants, but only upon the standard monthly allotment. Thus the court concluded that a standard of aid which met the 62 percent level "caps the County's total responsibility." It is from this aspect of the judgment that plaintiffs appeal.

## DISCUSSION

There are four issues of statutory interpretation before us. First, do section 17000.5 and newly enacted section 17001.5 permit a county to adopt as a sufficient general assistance standard of aid one which reduces benefits to individual recipients who share housing with unrelated individuals? Second, under the new legislation can the county lawfully impose the standard of aid it enacted but which the trial court ordered it not to apply? Third, under section 17000.5 may the county reduce grants for in-kind benefits without a factual finding that the reduced amounts provide minimum subsistence? Fourth, does section 17000.5's level of sufficiency for general assistance aid include special needs grants?

### 1. *Appeal*

#### a. *Sufficient Standard of Aid Under Section 17000.5*

The study to which the trial court alludes in its memorandum of decision is often called a *Boehm* study after the case which first held that the level of general assistance payments must be set with reference to a factual study of what amount is needed for minimum subsistence. (*Boehm* v. *County of Merced* (1985) 163 Cal.App.3d 447, 452 [209 Cal.Rptr. 530].) In a subsequent decision after remand the appellate court held that a general assistance grant must include moneys for basic necessities which it defined as food,

clothing, housing (including utilities), transportation and medical care. (*Boehm* v. *Superior Court, supra,* 178 Cal.App.3d 494, 502 (*Boehm II*).) Deleting an allocation for any of those needs is permissible only if the county can show by a study that the need will be met by another program available to recipients of general assistance. (*Ibid.*)

In *Boehm II* the court expressly found that its holding was compelled by both section 10000 which declares the purpose of the statutory scheme to be the provision of "appropriate aid and services to all of [the state's] needy and distressed," and by sections 17000 and 17001 which impose upon the county the duty to relieve and support the indigent and delegate to the county board of supervisors the duty of adopting "standards of aid and care" for the poor and indigent. (*Boehm II, supra,* 178 Cal.App.3d at pp. 500-502.)

Immediately prior to the enactment of section 17000.5 in January of 1991, another panel in this district decided *Whitfield* v. *Board of Supervisors* (1991) 227 Cal.App.3d 451 [277 Cal.Rptr. 815]. *Whitfield* found arbitrary and capricious Alameda County's practice of setting general assistance benefits at exactly $1 less than benefits paid under AFDC absent any factual support that such a standard of aid met minimum subsistence needs in the county. (*Id.* at pp. 460-461.) Prior to *Whitfield* other cases had found county standards of aid wanting for lack of factual support. (*Guidotti* v. *County of Yolo* (1989) 214 Cal.App.3d 1552, 1566 [271 Cal.Rptr. 858]; *Poverty Resistance Center* v. *Hart* (1989) 213 Cal.App.3d 295, 307 [261 Cal.Rptr. 545] [reversing judgment sustaining demurrer for failure to state a cause of action under § 17001].)

■ Against this background of case law, the county maintains that the provision of section 17000.5 setting 62 percent of the federal poverty level as "a sufficient standard of aid" was the legislative equivalent of a repeal of *Boehm.* It argues that after the enactment of section 17000.5, any county which meets the 62 percent requirement has by definition provided minimum subsistence needs, ergo the study requirement need not be met. We find that reading of the section to be compelling.

b. *Unrelated individuals in shared housing*

■ Prior to the recent enactment of section 17001.5 it remained unclear whether or not the county could apply the family unit aid ratios employed in the federal poverty line to unrelated persons living in shared housing without first conducting a *Boehm* study. That question has been now answered in the affirmative.

Section 17001.5, subdivision (a)(2) provides in pertinent part that a county may "(A) Establish a standard of general assistance for . . . recipients who

share housing with one or more unrelated persons or with one or more persons who are not legally responsible for the applicant or recipient." Such a standard of aid may be reduced "for a single adult recipient . . . by not more than . . . [¶] [f]ifteen percent if the recipient shares housing with one other person . . . [¶] [t]wenty percent if the recipient shares housing with two other persons . . . [¶] [t]wenty-five percent if the recipient shares housing with three or more other persons. [¶] (B) Any standard of aid adopted pursuant to this paragraph shall constitute a sufficient standard of aid for any recipient who shares housing."

Without question the effect of section 17001.5 is to permit a county to reduce general assistance aid to groups of unrelated adults living together, and so long as the reductions do not exceed the percentages set forth the county need not conduct a *Boehm* study as to the sufficiency of its aid levels.

### c. *May the County Reduce Aid Below the Statutory Limits?*

Section 17001.5 also provides in pertinent part that "[c]ounties with shared housing reductions larger than the amounts specified in subparagraph (A) as of August 19, 1992, may continue to apply those adjustments." (§ 17001.5, subd. (a)(2)(C).) Thus the statute clearly grandfathers in standards of aid with benefit reductions greater than those it expressly sets forth.

 The county asserts that under this provision it should be allowed to apply its general assistance benefit schedule which exceeds the statutory schedule because those reduced benefits were enacted by the county on September 17, 1991, and then reduced further on March 24, 1992.[5] These reduced standards of aid though adopted by the county board of supervisors were not being applied as of August 19, 1992, because the trial court had stayed their implementation and that stay was continued by a writ of supersedeas from this court pending resolution of the appeal. Plaintiffs insist that the county's reduced standards of aid were not being *applied* as of August 19, 1992, and therefore do not come within the explicit provisions of subparagraph C.

There are two reductions which the county attempted to impose. The first enacted September 17, 1991, adopted reduced aid for single adults in shared housing, and the second of March 24, 1992, adjusted the general assistance aid levels to conform to AFDC aid levels. In our earlier, and now vacated opinion, we concluded that the county's aid schedule adopted in September

---

[5]We hereby take judicial notice under Evidence Code section 452, subdivision (b) of Resolution No. 92/186 adopted March 24, 1992, and designed to take effect as of May 1, 1992.

1991 was infirm precisely because it provided reduced benefits to nonrelated adults sharing housing, which we concluded was not permitted under the federal poverty line definitions.[6]

The Legislature has now expressly permitted such reductions. (§ 17001.5, subd. (a)(2)(A).) ▇ A substantial change in the language of a law permits the inference of a legislative intent to change its meaning. (*W. R. Grace & Co. v. Cal. Emp. Com.* (1944) 24 Cal.2d 720, 729 [151 P.2d 215].) ▇ Thus, the Legislature's addition of section 17001.5 permitting reduced benefits for unrelated adults sharing housing represents a change in the level of the standard of aid which a county can adopt and still come within the safe harbor of section 17000.5.

The circumstances surrounding the amendment, however, do not indicate that the new provision was merely a clarification of existing law. Quite the contrary. At the same time the Legislature added the section permitting reduced aid to unrelated adults sharing housing it amended section 17000.5 to clarify existing law. In adding subdivision (e) to the section permitting annual adjustment of general assistance to bring it into line with AFDC benefits the amendment explicitly provides that " 'any adjustment' includes, and, *prior to the addition of this subdivision, included,* statutory increases, decreases, or reductions in the maximum aid level in the county under the Aid to Families with Dependent Children program . . . ." In amending section 17000.5 the Legislature made clear that it was clarifying, not changing, the law. Had it been doing the same with respect to reduced aid to unrelated adults, it would presumably have said so.

As of August 19, 1992, the county was not applying its schedule of reduced benefits. Thus, it is not a reduction which the county "may continue to apply." Moreover, since we concluded that the county's benefit schedule for unrelated adults in shared housing was infirm under prior law without a *Boehm* study it would be nonsensical to now put it into effect.

If the county had been applying a valid nonconforming shared housing benefit schedule as of August 19, 1992, then indeed the new legislation would permit the county to continue to apply that schedule as further

---

[6]We specifically concluded in our earlier opinion that the family unit definitions used in the federal poverty guidelines encompassed only "an unrelated individual" or a "group of two or more persons related by birth, marriage, or adoption who live together." (56 Fed. Reg. 6860 (Feb. 20, 1991); 42 U.S.C. § 9902(2).) Thus, we reasoned that the county could not apply to unrelated individuals the reduced benefit schedule set forth in the federal guidelines and still come within the safe harbor of section 17000.5. We concluded that reductions for unrelated adults in shared housing could only be imposed if a *Boehm* study demonstrated that such aid levels met minimum subsistence needs.

adjusted on March 24, 1992. Because it was not applying a valid schedule it is now limited to the schedule of aid levels set out in the statute. (§ 17001.5, subd. (a)(2)(A).)

### d. *In-kind Benefits*

By Resolution No. 91/606 the board of supervisors adopted a general assistance standard of aid for homeless individuals equivalent to one budget unit or $342 per month. They further provided, however, that such a person who was living in either a public or private shelter would be credited with income of $10 per day as an approximation of the value of such food and shelter. Furthermore, a homeless person who either refused shelter placement or was "disqualified for available shelter on account of his or her willful conduct" would likewise be credited with income of $10 per day for the value of the shelter accommodation.[7]

The trial court found this requirement void on the basis that it was "not facially permitted" by section 17000.5, and was therefore permissible only if a *Boehm* study confirmed that under the new scheme minimum subsistence needs would be met. In our earlier opinion we addressed the question of whether the value of cash grants and in-kind benefits could be included in the general assistance standard of aid described by section 17000.5. We concluded that they could under the prior form of the section, and the Legislature has now amended 17000.5 to expressly permit inclusion of in-kind benefits.[8]

---

[7]On November 5, 1991, Resolution No. 91/717 was adopted amending Resolution No. 91/606. It added the following section to the portion of the earlier resolution dealing with in-kind benefits to the homeless:

"Based on the reports and studies of the Social Services Department, the Board of Supervisors finds that the actual cost of food and housing at a county shelter is $22 per day, and that $10 per day should be treated as income to homeless General Assistance eligibles who are sheltered or who refused or are disqualified for shelter calculated at $3 per day for food . . . and $7 per day for housing. . . . The Board of Supervisors further finds that $10 per day is less than a pro-rata allocation of the monthly General Assistance allowance for a 1 person budget unit."

The administrative regulations (dept. mem. No. 192 dated Nov. 14, 1991) adopted by the social services department provide that the $10 per day be calculated on the basis of a 30-day month, leaving a cash grant of $42. Those regulations further provide that no deduction from the grant of an applicant willing to accept shelter is made unless shelter space is actually available.

[8]Subdivision (a) as amended now reads: "The board of supervisors in any county may adopt a general assistance standard of aid, including the value of in-kind aid, that is 62 percent of a guideline that is equal to the 1991 federal official poverty line and may annually adjust that guideline in an amount equal to any adjustment provided under Chapter 2 (commencing with Section 11200) of Part 3 for establishing a maximum aid level in the county."

██ Plaintiffs contend that the recent amendment of section 17000.5 invalidates the county's inclusion in its general assistance standard of aid of either in-kind aid from private sources or county aid from nonsection 17000 programs. We are not persuaded that the amendment precludes what the county has sought to do.

By its September 17, 1991, resolution the county sought to credit a homeless person for income of $10 per day for each day's worth of shelter and food received while residing in *either* a county or private shelter. As now written the section makes no distinction as to the source of aid and we therefore find no support for the limitations plaintiffs would impose.

We conclude that the trial court erred insofar as it held under the prior form of section 17000.5 that the county must do a *Boehm* study before it may use the value of in-kind food and shelter benefits provided to the homeless to meet the standard of aid sufficiency requirement established by section 17000.5.[9] Moreover we conclude that under the new section 17000.5 the county may include the value of in-kind aid from noncounty or nonsection 17000 programs in setting its standard of aid.

In their pleading, plaintiffs allege that by requiring homeless general assistance recipients to agree either to accept shelter residence or forgo receiving a full cash grant, the county violates their constitutional right of privacy. The trial court, having ruled that the requirement could not be imposed until a *Boehm* study had been completed, found the issue moot.

Plaintiffs suggest this court could reach their privacy claim, but given the posture of the case that claim is not yet ripe for decision and we express no opinion as to its merits. The superior court found the resolution enacting the in-kind benefits rule to be void and issued an order directing the county to refrain from implementing it. This court granted plaintiffs a writ of supersedeas vacating the stay pending appeal of the superior court's order. If, once this decision becomes final, the county implements its in-kind shelter rule, plaintiffs remain free to raise their privacy claim. Likewise they would be free to pursue their claim that aspects of the shelter rules violate the county's duty under sections 10000, 17000 and 17001 to set standards of assistance which are humane, reasonable, and provide the basic necessities of life.

---

[9]Plaintiffs raise other objections to the county's resolution permitting it to credit residents $10 for each day spent in a shelter. They hypothesize that deducting the value of half a month's shelter residence would leave a general assistance recipient with insufficient funds to live on for the rest of the month. They may or may not be correct, but their scenario has no factual support in this record.

## 2. *Plaintiffs' Appeal*

### *Special Needs*

█ In their appeal, plaintiffs contend the trial court erred in concluding that section 17000.5 created a cap at 62 percent of the poverty line on all county liability for general assistance aid, including grants which the county makes for special or emergency needs. The trial court concluded that section 17000.5 was "unambiguous. The legislature, which knows how to deal with special needs in welfare matters, did not limit the statute's ambit to 'basic' or 'monthly' needs, therefore, the legislature meant that if the County opted to enact a standard of aid equal to that set forth in § 17000.5(a), it is done and this caps the County's total responsibility. It [the county] does not now need to do a study pursuant to case law existing before passage of § 17000.5."

Plaintiffs urge us to find the trial court's reading of section 17000.5 erroneous. They argue here, as they did below, that in the statutes governing maximum aid to AFDC recipients, the maximum grant amounts do not include additional amounts which may be paid for special needs. (See, e.g., § 11450, subd. (e).)[10] They insist general assistance benefits are meant to be tied to the dollar levels of AFDC benefits. Since AFDC special needs grants are expressly add-on's to the monthly AFDC grant, plaintiffs maintain the same should be true of general assistance. Defendants take the opposite position, arguing that since the special needs grants are not expressly exempted by section 17000.5, the county's sufficient standard of aid may include grants for special or emergency needs.

Each side finds support in letters from legislators involved in passage of a bill which added section 17000.5.[11] The flatly contradictory versions of legislative intent expressed in these letters vividly demonstrate why appellate courts reject statements of intent as understood by individual members

---

[10]That section provides: "In addition to the amounts payable under subdivision (a) and Section 11453.1, a family shall be entitled to receive an allowance for recurring special needs not common to a majority of recipients. These recurring special needs shall include, but not be limited to, special diets upon the recommendation of a physician for circumstances other than pregnancy, and unusual costs of transportation, laundry, housekeeping service, telephone, and utilities. The recurring special needs allowance for each family per month shall not exceed that amount resulting from multiplying the sum of ten dollars ($10) by the number of recipients in the family who are eligible for assistance."

[11]The bill which was urgency legislation took effect on June 30, 1991. (Stats. 1991, ch. 91, § 34, No. 3 West's Cal. Legis. Service, p. 410.) On August 22, 1991, Assemblyman Bates received unanimous consent to publish a letter in the Assembly Journal to the effect that "[t]he standard set forth in that section was meant to apply to the maximum monthly benefit level and not to any emergency or special needs payments for which an applicant or recipient of general assistance might otherwise be eligible." (Assem. J. (1991 Reg. Sess.) p. 3740.) By

of the Legislature. (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 589-590 [128 Cal.Rptr. 427, 546 P.2d 1371]; *Commodore Home Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 221-222 [185 Cal.Rptr. 270, 649 P.2d 912] (dis. opn. of Mosk, J.).)

On its face, section 17000.5 speaks only of "a general assistance standard of aid" without distinguishing between flat monthly grant payments made to everyone eligible for general assistance and those supplemental grants made to cover recurring or nonrecurring special expenses peculiar to some recipients. The Legislature can and has distinguished between the two types of grants in statutes governing the AFDC program. (See §§ 11450, 11452, subd. (b).)

Plaintiffs insist that special needs, like health care provided through county hospitals, have traditionally been met not by the flat monthly general assistance grant. Thus, they argue special needs grants were not intended to be encompassed by the "standard of aid" language used in section 17000.5. They cite language in *Poverty Resistance Center* v. *Hart, supra,* 213 Cal.App.3d at pages 309-310, to the effect that a county is not free to average out of existence needs common to only some recipients. The case is inapposite. It involved a challenge to the factual support for general assistance grant levels set by Sacramento County. (*Id.* at p. 302.) The issue before us is not *what needs* a county must consider in setting grant levels, but whether the Legislature may eliminate the *requirement of county need studies* so long as the county sets a standard of aid equal to 62 percent of the official poverty guidelines.

There is nothing in the plain language of section 17000.5, subdivision (a), excluding special needs grants from the "general assistance standard of aid." Therefore we conclude, as the trial court did, that a county standard of aid which includes monthly flat grants and special needs grants equivalent to 62 percent of the 1991 federal official poverty line is "sufficient" within the meaning of section 17000.5, subdivision (b).

## DISPOSITION

We affirm the judgment of the superior court which found the county could not apply its budget unit standard of aid to unrelated individuals sharing housing without conducting a *Boehm* study. We affirm that portion of

declaration of October 24, 1991, Senator Marian Bergeson took issue with the Bates view, insisting that his letter "does not, insofar as it purports to express an intention to limit the General Assistance cap provision of Welfare and Institutions Code section 17000.5 to monthly payments, correctly express the tenor of the proceedings before the Task Force and Conference Committee on Realignment or the Legislature when AB 948 was adopted."

the judgment which holds that the county may include special needs grants in its standard of aid used to satisfy section 17000.5, subdivision (b), without conducting a *Boehm* study. We reverse that portion of the judgment voiding the county's in-kind benefits rule for homeless individuals eligible for general assistance.

We affirm the enforcement order insofar as it has prohibited the county from applying its reduced general assistance standard of aid to unrelated persons sharing housing. We reverse the order's prospective application to any reduced standard of general assistance aid for unrelated persons sharing housing which the county may adopt pursuant to section 17001.5, subdivision (a)(2)(A). We reverse that portion of the enforcement order enjoining the county from enforcing its in-kind benefits rule as to homeless persons eligible for general assistance.

In the interests of justice both parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 26(a).)

Anderson, P. J., and Reardon, J., concurred.

A petition for a rehearing was denied December 30, 1992, and the petition of plaintiffs and appellants for review by the Supreme Court was denied February 25, 1993.