Filed 2/26/14  In re Tyler G. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re TYLER G., a Person Coming Under the Juvenile Court Law. | B250222<br>(Los Angeles County<br>Super. Ct. No. CK30123) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>ROBIN G.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Donna Levin, Juvenile Court Referee.  Affirmed.

Kate M. Chandler, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

Mother Robin G. appeals the dependency court's orders at the six-month review hearing held pursuant to Welfare and Institutions Code section 366.21,[1] contending she was not provided reasonable reunification services and that there was no risk of detriment in returning her son Tyler G. to her care. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]

### 1. *Jurisdiction and Disposition*

In August 1997, Mother gave birth to her daughter Amanda G. at a McDonald's and Mother and the baby were hospitalized at the Kaiser Permanente Hospital on Sunset Boulevard for two days. Mother left without the baby and Department of Children and Family Services (DCFS) was unable to locate Mother. In 1998, DCFS located Mother, who told them she left home at age 18 due to physical and sexual abuse by her father and brother. Mother never contacted DCFS and the case terminated in April 2000 when Amanda was adopted. Mother used cocaine and worked as a prostitute.

On August 30, 2012, DCFS received a referral regarding Tyler, who was born one month prematurely on August 20, 2012. Mother initially had difficulty bonding with Tyler and properly feeding him. However, when discharged from the hospital, she demonstrated the ability to properly care for him. The hospital had to issue mother a car seat, baby clothes, diapers and formula. Mother had limited supplies and did not appear able to acquire more.

Mother's pediatrician at the hospital told the social worker that Mother "seemed a little off." He explained that because Tyler was not feeding well, the hospital told Mother he would need to stay for a few days. At first, Mother seemed to understand, but five minutes later, Mother was upset and wondered why she and the baby could not go home. Mother stated she had no family or friends.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] A portion of our factual statement is taken from our prior opinion in this matter, *In re Tyler G.* (Sept. 5, 2013, B247249) [nonpub. opn.]. Empty brackets [] denote deletions from the prior opinion.

2

On August 31, 2012, the social worker went to Mother's room at a residence hotel and spoke to Robert Collins, the maintenance man. He told the social worker Mother had lived at the hotel for about a year, and he did not see any visitors at Mother's room. Collins was concerned about Tyler because of the way Mother handled him and put him in the car seat. "She handles him like he is a toy. He is in his little carrier and she is rough with him. She swings [the car seat] around like there is no baby inside it. I have seen this . . . three or four times since she brought the baby home." Collins suspected that Mother had "split personalities." "Mother would be fine one minute and be friendly, within minutes she [would] get[] upset and start[] yelling or talking to herself." Mother would answer herself, stop in the hallway and talk to the wall or empty space.

Christine Directo, the property manager of Mother's residence hotel told the social worker that Mother would be evicted on September 9, 2012. She had seen Mother swinging the baby carrier around and was "happy to see the baby [was] still alive." She believed Mother was unstable, but did not suspect substance abuse. Mother would talk to her and suddenly turn to her side and start talking to someone who was not there. Mother got upset easily and changed her tone, and Mother would forget information from one minute to the next. Dave Ellis, the desk clerk, resided a few doors away from Mother's unit and heard her screaming "[s]hut up, [s]hut up" at 1:00 a.m. He heard Tyler crying at night and Mother screaming at him. Ellis also observed Mother speaking to herself and swinging the baby carrier roughly. []

The social worker and two police officers visited Mother's room. Mother invited them in. The residence was dark and Mother stated the light fixtures did not work. The blinds were closed and had a sheet over them. The room had a twin size mattress and several puddles of water on the floor. The mattress was filthy and had no linen. On a small table were approximately 20 bottles of champagne, beer, and alcohol. Some were open and empty or half full. A small refrigerator contained two water bottles, rotten broken eggs, and one empty can of baby formula. The refrigerator was filthy and had living and dead cockroaches inside. The entire apartment had cockroaches crawling all

3

over.  Mother stated she had an infestation of cockroaches and bedbugs.  The baby items included the car seat/carrier, one plastic laundry basket and about 10 newborn outfits, four small prefilled baby bottles, one small bag of diapers, travel size baby shampoo, and a small bag of baby wipes.  The baby items had cockroaches all over.  There were two large windows with no safety gates or screens.  []

Mother intended to move and return to school for the fall semester to study to become a radiology technician.  []  Mother denied any history of mental illness or hallucinations.  She stated that when she seemed to be talking to herself, she was actually talking on the phone.  Mother denied yelling at Tyler, or handling him roughly.  Mother stated she did not have any other children, and once had a stillborn baby.  When confronted with her 1997 case, Mother stated, "Oh, you mean Amanda?"  Mother stated Amanda was born on the streets and was taken by DCFS.  Mother was never told how she could get Amanda back.

[DCFS detained Tyler.  Mother told DCFS] Tyler's father [Carlos G.] used drugs, but they were legal drugs, and he had been violent with her on the phone.  She did not know where he lived but gave the social worker a phone number for Carlos G.  DCFS contacted Carlos G., who told them he has known Mother for 20 years.  He met Mother on the street; Mother works the streets of Hollywood and asks him for money several times a year.  []  He has seen track marks on Mother's arms and Mother smelled to him like she used methamphetamine.  Carlos G. believed Mother had some mental health problems but he was not sure.  []  He does not believe he is Tyler's father.

Mother admitted to the social worker she had a 16-year-old son named Jonathan who lived in Kentucky.  DCFS learned that Mother was arrested in August 1997 for soliciting in Los Angeles.

DCFS filed a petition dated September 6, 2012, alleging failure to protect under Welfare and Institutions Code section 300, subdivision (b), based on Mother's mental and emotional problems, and the unsanitary condition of Mother's home.

4

At the September 6, 2012 detention hearing, the court found Carlos G. to be Tyler's alleged father.  []  The court ordered Tyler detained and placed in foster care, and granted Mother visitation three times a week, for three hours per visit.

DCFS's jurisdiction report stated that Carlos G. denied paternity and was requesting a DNA test.  Carlos G. was in a relationship and did not want to be involved with Tyler.  Tyler's caregiver had reported that often Mother's phone did not work or there was difficulty contacting Mother.  []

Mother's visitation with Tyler was haphazard.  She missed the first visit, informing the social worker she woke up late.  Mother was tardy to the second visit because she could not find the location.  Mother's interaction with Tyler was appropriate.  Mother was tardy to the third visit but interacted appropriately with Tyler.  Mother was not well groomed, and the foster mother reported that Mother kept repeating that she should not be going through this, it was retaliation, and she would do anything to get her baby back.  Mother did not show for the fourth visit, nor did she call to cancel.  Mother called the foster mother and apologized, but then stated there were delays with getting a bus.  For the fifth scheduled visit, Mother called and canceled.  Mother called the foster mother and yelled at her.

On September 10, 2012, the social worker visited Mother's new residence.  The apartment was a single unit that appeared clean.  There was a strong smell of cigarettes.  Mother shared a toilet and shower, and the room had a bed and dresser.  A small refrigerator was clean but empty.  Mother had baby bottles, travel size baby toiletries, and baby clothing.  The bottles were dusty and appeared to have roach feces on them.  Mother agreed the bottles would need to be cleaned prior to use.

DCFS recommended that no reunification services be provided pursuant to Welfare and Institutions Code section 361.5, subdivision (b)(10) and (11).

At the September 24, 2012 hearing, the court took evidence from the social worker regarding the conditions of Mother's room at the residence hotel at the time of detention, the statements of the staff at the residence hotel, Mother's new residence, and her

5

discussions with the pediatrician at the hospital regarding Mother and Tyler. The social worker did not recall seeing a crib in Mother's new residence. Mother testified that she complained to the residence hotel about the lack of working lights or heat, the insect infestation, and that she had filed complaints with the housing and health departments, and that she had won her case against the hotel. She agreed to move out to seek federal housing assistance. Mother asserted she had a crib in her new residence. Mother claimed that she did not receive notice of the proceedings with respect to Amanda.[3]

The dependency court sustained the allegations of the petition, and ordered Mother to participate in individual counseling to address case issues, complete an interactive parenting program, and participate in mental health counseling, including a psychiatric examination pursuant to Evidence Code section 730, and to take all prescribed medications. Mother was given monitored visitation.

### 2. *Six-Month Review*

DCFS's six-month review report for the scheduled March 25, 2013 hearing stated that Tyler remained placed in foster care. On January 23, 2013, the social worker had spoken to Mother's therapist and learned that the therapist was an unlicensed intern who would be getting her master's degree that summer. Mother's first session had been on January 9, 2013, and the social worker informed Mother's therapist she would have to determine whether the therapy would be appropriate given Mother's history. On January 24, 2013, the social worker informed Mother that she would have to go to a different agency for therapy, and Mother became upset, cursed at the social worker, and hung up the phone.

The social worker gave Mother information on an interactive parenting program at Wallis Annenberg Child Development Center. The program consisted of class twice a week for two hours for one year. Mother was upset and told the social worker that the social worker "'just wants to mess everything up for me[;] first the counseling[,] now

---

[3] End of quotation from prior opinion.

this. You just don't like me.'" Mother stated she wanted a new social worker and hung up.

On January 22, 2013, the intake worker at Wings of Refuge foster agency (the agency through which Tyler was placed) reported that Mother had called and was upset. Mother called the intake worker's supervisor and used profanity. On the same date, Mother called another worker at Wings of Refuge and accused the him of trying to mess up her visits with her child and hung up on him.

On January 22, 2013, the social worker spoke to a supervisor at the Wallis Annenberg Child Development Center. The supervisor reported that Mother needed anger management. Mother had been observed in the hallway before class with other parents and children and used profanity in front of all of the families. That same day, the social worker spoke to Mother, who told the social worker to "'stop fucking up my case.'" At mother's request, on January 22, 2013, the case was assigned a new social worker.

Tyler was moved to a new foster home on January 18, 2013, and was doing well in his new foster home.

DCFS experienced some difficulties arranging for transportation of Tyler to visits and parenting classes. The new social worker noted that a regular schedule of monitored visitation had not yet been arranged. Tyler's foster family agency was unable to facilitate transportation to visits. On January 31, 2013, the social worker took Tyler to visitation with Mother. In early February 2013, Tyler was ill, and his visits were cancelled. After Mother complained about the lack of regular visitation, the social worker apologized and assured Mother that DCFS was attempting to arrange regular visitation, appropriate transportation, and a regular monitor for visitation. The social worker arranged for visitation to resume at the foster family agency.

When Tyler was well enough to visit with Mother, Mother complained that Tyler was not feeling well. The social worker believed Mother was attempting to get out of the visit and using Tyler's illness as an excuse. After visiting with Tyler, Mother insisted he

was ill and ended the visit. During the remainder of February 2013, Mother missed her visits with Tyler due to a lost bus pass and her own illness.

On March 1, 2013, Tyler went to the emergency room with ongoing respiratory concerns and asthma. On March 6, 2013, Mother left a message denying she was at fault for missing visits with Tyler. On March 7, 2013, the social worker went to Mother's home. The home was in a motel-style apartment with one bedroom and one bathroom. There was no kitchen, but Mother had a small refrigerator, a working sink, and an electric griddle. The room was clean. Mother agreed that she would follow up with her therapist for a psychiatric examination.

On March 14, 2013, Mother did not show up for scheduled visitation with Tyler. Mother left two messages on the social worker's telephone regarding the missed visit. She threatened that if Tyler was not returned to her at the next court date, she would hire a private attorney. In addition, her attorney would stop the mental evaluations, and Mother denied she had any mental health issues.

A letter from Mother's therapist-trainee stated that Mother had attended 10 sessions. The therapist did not believe Mother had any psychological disorders, but further testing was required. The therapist's report stated that Mother ran away at age 15 and used substances in her late teens and early 20's. Mother denied current drug use, and denied engaging in solicitation. The therapist believed Mother had a "good grasp" of how to care for Tyler.

On March 19, 2013, Mother prematurely ended her visit with Tyler, claiming he was ill.

DCFS recommended that reunification services continue for Mother, and that Mother comply with a completed psychological assessment and psychotropic medication as required, and continue individual counseling, parenting, and monitored visitation.

At the March 25, 2013 hearing, Mother requested a contested hearing. The last minute information prepared for the continued hearing date of May 16, 2013 stated that on April 30, 2013, Mother left a message she would miss visitation because she was

8

getting a psychological assessment, but would not do a psychiatric assessment because nothing was wrong with her.

On April 25, 2013, DCFS held a Team Decision Meeting. DCFS noted positive developments with respect to Mother's case included that Mother had attended 16 weeks of therapy; the therapist recommended an MMPI personality test; Mother was participating in parenting with Tyler; Mother had stable housing and the home was appropriate; Mother interacted well with Tyler; and Mother wanted to become a radiology technician. DCFS also noted concerns with Mother's case, including that Mother had not obtained a psychiatric assessment; missed visits with Tyler due to the change in location of visits; called the social worker two to three times a day; and had difficulty understanding DCFS's concerns about Tyler from its perspective. DCFS suggested that Tyler remain in foster care while mother continued with reunification, DCFS would ask the court to order a psychiatric assessment, Mother would receive a Regional Center evaluation, and Mother's therapist to submit progress reports.

At the May 16, 2013 hearing, Eliza Velasquez, Mother's social worker, testified that she had been overseeing Mother's reunification since the end of January 2013. She had not given Mother a referral for a psychiatric evaluation. However, Mother had been seeing a therapist and attending parenting classes, and obtained two assessments, one at Exodus and one at Downtown Mental Health. However, Mother had failed to complete a psychiatric evaluation, which Velasquez believed created a risk for Tyler.

Mother participated in the interactive parenting class. At the time of the TDM in late April 2013, the therapist advised DCFS that Mother had walked out of one of the most recent therapy sessions. Mother's living arrangements were satisfactory.

Velasquez testified that Mother gets upset quickly and yells and argues. It was difficult to provide Mother with appropriate services because Velasquez could not have a conversation with Mother. When Tyler was detained, Mother felt DCFS "did her wrong." Velasquez tried to explain to Mother that she needed to comply with her current plan and could not worry about the past. Velasquez wanted a psychiatric assessment

9

because Mother went to the locations DCFS provided to obtain a psychiatric assessment, but Mother would tell the agencies that she did not need one, and the agencies would not perform an evaluation. Thus, without a court order, Mother would not obtain an assessment. Mother testified that DCFS did not give her any mental health referrals; rather, she located the agencies herself. DCFS did not provide the agencies with any information so they could understand why Mother was there.

DCFS argued that Tyler should remain in foster care. Mother was exhibiting mental health issues which she refused to acknowledge and had poor interaction with DCFS (multiple phone calls, argumentative conversations with DCFS staff). Further, Mother did not have consistent visitation with Tyler, and missed more visits than she attended and was cutting some visits short. Mother argued that she had complied with nearly her entire case plan, but DCFS failed to give her adequate referrals for mental health testing.

The court stated that even if it were to find that no services had been provided to Mother, the remedy would be six more months of reunification, not return of Tyler to her. The court had ordered Mother to have a psychiatric evaluation, and to take prescribed medication, yet Mother had not followed through on these orders. On the other hand, Mother had been complying with parenting classes and for the most part with visitation. The court stated it needed a psychiatric assessment of Mother to determine the scope of Mother's emotional and mental issues. The court ordered a psychiatric evaluation of Mother to be conducted through USC, and found that return of Tyler to Mother would not be in his best interests. The court also found that reasonable reunification services had been provided, Mother's compliance with her case plan had been moderate, and that there was a substantial probability Tyler would be returned to her custody by the 12-month review hearing: Mother had regularly and consistently visited Tyler; had made significant progress in resolving the problems that led to his removal; and demonstrated a capacity and ability to complete the objectives of the treatment plan. The court set the next review hearing for September 23, 2013, and gave Mother an additional six months

of reunification services.  The court also set a progress hearing for July 11, 2013 on Mother's psychiatric evaluation.

## DISCUSSION

Mother contends she was not provided with reasonable services because DCFS did not facilitate adequate visits with Tyler, DCFS did not ensure that Mother's referrals for a psychiatric evaluation actually performed an evaluation, and further that the dependency court erred in finding there was a substantial risk of detriment in returning Tyler to her care because other than the lack of a psychiatric examination, Mother was in compliance with her case plan.  She therefore requests that we reverse the dependency court's orders and findings of May 16, 2013.

### A.    Provision of Reunification Services

The paramount goal in the initial phase of dependency proceedings is family reunification.  (*In re Precious J.* (1996) 42 Cal.App.4th 1463, 1472.)  "At the disposition hearing, the court may order reunification services to facilitate reunification between parent and child."  (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 454.) These services must be "designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300."  (§ 362, subd. (d).)  Accordingly, a reunification plan must be appropriately based on the particular family's unique facts. (*In re Alexis E.*, at p. 454.)  Visitation is a critical component of a reunification plan.  (*In re Luke L.* (1996) 44 Cal.App.4th 670, 679.)  Thus, DCFS "must make a good faith effort to develop and implement a family reunification plan.  [Citation.]  '[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult. . . .'  [Citation.]"  (*Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1345.)  "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances."  (*In re Misako R.* (1991) 2

11

Cal.App.4th 538, 547.) We review the dependency court's findings for substantial evidence. (*Amanda H.*, at p. 1346.)

The purpose of the six-month review hearing is to review the parties' progress in carrying out the dependency court's dispositional orders. At every review hearing between disposition and the section 366.26 hearing, the court must return the child to the parent or guardian unless there is a substantial risk of detriment to the safety, protection, or physical and emotional well being of the child. (§ 366.21, subd. (e); Cal. Rules of Court, rule 5.107(e).) In determining whether to return the child to the parent or guardian, the court must consider the social worker's report and recommendations, the efforts and progress made by the parent or legal guardian and the extent to which the parent or guardian availed themselves of services. (§ 366.21, subd. (e); *In re Jesse W.* (2007) 157 Cal.App.4th 49, 61.) During the first review period, which runs from roughly the jurisdictional hearing to the six-month review hearing, "services are afforded essentially as a matter of right (§ 361.5, subd. (a)) unless the trial court makes one of a series of statutorily specified findings relating to parental mental disability, abandonment of the child, or other specific malfeasance (§ 361.5, subd. (b))." (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 845.)

If the child is not returned to the parent or guardian's custody at the six-month review hearing, the court must make appropriate findings under section 366, subdivision (a), and must offer additional reunification services believed to facilitate return of the child to the parent. The court must also determine whether the services made available were reasonable and direct that any services previously ordered be continued. (§ 366.21, subd. (e).)

In particular, Mother contends DCFS did not adequately facilitate visitation, and that DCFS admitted that at the end of January 2013 visitation was not regularly scheduled. Thus, Mother did not receive adequate visitation and the situation should be remedied by ordering six months additional services. She further contends DCFS did not adequately provide a psychiatric evaluation and did not follow up to ensure she had

received one:  because she believed her psychiatric problems were concocted by her landlord as retaliation for disputes she had with him, and her therapist and others who evaluated Mother stated she had no health problems, based on her self-assessment, the agencies saw no reason to go forward with an evaluation.  Thus, her services were wholly inadequate and as a result the matter must be reversed.  We disagree.

Here, we agree that visitation was sporadic, but the fault appears to be equally divided between Mother and DCFS.  Mother missed some visits and cut others short, while DCFS initially had difficulty arranging transportation for Mother or ensuring that visitation took place.  Further, DCFS did not follow through to ensure Mother received a psychiatric evaluation.  A psychiatric evaluation would have permitted DCFS timely to evaluate its case plan in light of any mental or emotional issues Mother may have.  However, any remedy for inadequate provision of services to Mother would be the provision of additional services, including visitation, which the dependency court ordered.  Hence, Mother can show no prejudice from the dependency court's order on this issue.

## B.        Finding of Detriment in Return of Tyler to Mother's Care

Mother contends DCFS did not meet its burden of showing detriment if Tyler were returned to her care.  She has complied with her case plan and the court's findings of detriment were supported by insubstantial evidence because there is no nexus between the lack of a psychiatric evaluation and any danger to Tyler.  We disagree.

The initial task for the court at the six-month review hearing is to determine whether the child should be returned to the custody of his or her parent or guardian.  There is a statutory presumption the child will be returned to parental custody unless the court finds the child's return would create "'a substantial risk of detriment to the physical or emotional well-being'" of the child.  (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249.)  "At the review hearing held six months after the initial dispositional hearing, . . . the court shall order the return of the child to the physical custody of his or her parent . . .  unless the court finds, by a preponderance of the evidence, that the return

of the child to his or her parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e).) In making this determination, the court is to "consider the efforts or progress . . . demonstrated by the parent . . . and the extent to which he or she availed himself or herself [of] services provided." (*Ibid*.) The parent's failure "to participate regularly and make substantive progress in court-ordered treatment programs" is "prima facie evidence that return would be detrimental." (*Ibid*.)

Here, there was evidence that Mother suffered from mental and emotional health problems and was in denial that such problems existed. These problems were the root of the initiation of dependency proceedings, and as a result Mother was originally ordered to obtain a psychiatric evaluation. Mother located some clinics to obtain a psychiatric evaluation on her own, but never obtained a psychiatric evaluation because she told them she did not need a mental health assessment. Without an evaluation to assess Mother's capability to assume custody of Tyler, the dependency court was justified in finding detriment and did not err in refusing to return Tyler to her.

### DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, Acting P. J.


MILLER, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14