[No. S063313. Nov. 22, 1999.]

JIM HUNT, as Director, etc., et al., Petitioners, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
MARY GUIMBELLOT et al., Real Parties in Interest.

**COUNSEL**

L. B. Elam and Robert A. Ryan, Jr., County Counsel, and Michele Bach, Deputy County Counsel, for Petitioners.

John J. Sansone, County Counsel (San Diego), Diane Bardsley, Chief Deputy County Counsel, and Stephen R. Magruder, Deputy County Counsel, for County of San Diego as Amicus Curiae on behalf of Petitioners.

Kathleen Bales-Lange, County Counsel (Tulare) and Teresa Saucedo, Deputy County Counsel, for County of Tulare as Amicus Curiae on behalf of Petitioners.

No appearance for Respondent.

Northern California Lawyers for Civil Justice, Eugenie Denise Mitchell; Western Center on Law and Poverty, Richard A. Rothschild, Robert D. Newman, Melinda R. Bird; Legal Services of Northern California, Curtis L. Child and Karen A. Wells for Real Parties in Interest.

Catherine I. Hanson; Astrid Meghrigian; Lois Richardson; Remcho, Johansen & Purcell, Robin B. Johansen, Joseph Remcho and Philip C. Monrad for California Medical Association and California Association of Hospitals and Health Systems as Amici Curiae on behalf of Real Parties in Interest.

Catherine L. Fisk for California Law Professors as Amicus Curiae on behalf of Real Parties in Interest.

---

## OPINION

**GEORGE, C. J.**—The Legislature authorizes counties to calculate general assistance grants for indigent residents pursuant to a formula based upon the "federal official poverty line." (Welf. & Inst. Code, § 17000.5, subd. (a).)[1] It also permits a county to deduct from these cash grants the value of "in-kind aid" provided by the county, such as food, shelter, and up to $40 per month of medical care. (*Ibid.*) Sacramento County (hereafter the County) determined that it could satisfy its statutory obligation to provide medical care to indigent residents solely by providing the general assistance standard of aid specified in section 17000.5. Thus, it limited eligibility for county medical care to those residents financially eligible for general assistance. The County also decided that it could cease providing medical care even to residents eligible for general assistance, if it chose not to deduct $40 per month of the value of medical care from general assistance grants. The trial court entered a preliminary injunction precluding the County from implementing this eligibility standard for medical care, or any other standard that fails to consider a resident's financial ability to pay the actual costs of obtaining subsistence medical care. The Court of Appeal, however, agreed with the County's position and directed the trial court to dissolve the injunction.

We conclude that the trial court properly enjoined the County's implementation of these eligibility standards for receiving medical care. Section 17000—not section 17000.5—prescribes the extent of a county's obligation to provide medical care to its residents, and existing law establishes that the duty to provide medical care pursuant to section 17000 extends beyond the class of residents financially eligible for general assistance. Further, if there were any doubt regarding the correct interpretation of section 17000.5 with respect to a county's ongoing obligation to provide health care, the point has been clarified explicitly by the Legislature's recent declaration that, contrary to the Court of Appeal's determination, the general assistance standard of aid calculated pursuant to section 17000.5 is not intended to satisfy, in whole or in part, a county's duty to provide health care services under section 17000. (§ 17000.51.) Instead, as the trial court concluded, in determining eligibility for subsistence medical care pursuant to section 17000, counties must consider a resident's financial ability to pay the actual costs of obtaining such care. Accordingly, the judgment of the Court of Appeal is reversed.

---

[1]Further undesignated statutory references are to the Welfare and Institutions Code.

I

## A. *The Statutory Framework*

 Section 17000 imposes upon counties a mandatory duty to "relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident," when those persons are not relieved and supported by some other means.[2] (*Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 676 [94 Cal.Rptr. 279, 483 P.2d 1231].) In the last several decades many specialized relief programs have been enacted to support indigent individuals, but section 17000 "creates 'the *residual* fund' to sustain indigents 'who cannot qualify . . . under any specialized aid programs.' [Citations.]" (*County of San Diego* v. *State of California* (1997) 15 Cal.4th 68, 92 [61 Cal.Rptr.2d 134, 931 P.2d 312], italics added by the court in *County of San Diego* (*County of San Diego*).) This statute imposes upon counties a duty to provide medical care to indigent persons not eligible for such care under other programs. (*Id.* at pp. 92-94, 100-104.)

Section 17001 requires each county to "adopt standards of aid and care for the indigent and dependent poor."[3] Although this provision confers upon a county broad discretion to determine eligibility for—and the types of—indigent relief, this discretion must be exercised in a manner that is consistent with—and that furthers the objectives of—state statutes. (*County of San Diego, supra*, 15 Cal.4th at p. 100; *Mooney* v. *Pickett, supra*, 4 Cal.3d at pp. 678-681.) These objectives are "to provide for protection, care, and assistance to the people of the state in need thereof, . . . to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed," and to administer such aid and services "promptly and humanely." (§ 10000.) Furthermore, "[t]he provisions of law relating to a public assistance program shall be fairly and equitably construed to effect the stated objects and purposes of the program." (§ 11000.) "County standards that fail to carry out section 17000's objectives 'are void and no protestations that they are merely an exercise of administrative discretion can sanctify them.' [Citation.] Courts, which have ' "final responsibility for the interpretation of the law," ' must strike them down. [Citation.] Indeed, despite the counties' statutory discretion, 'courts have consistently invalidated . . . county welfare regulations that fail to

---

[2]Section 17000 states: "Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions."

[3]Section 17001 states: "The board of supervisors of each county, or the agency authorized by county charter, shall adopt standards of aid and care for the indigent and dependent poor of the county or city and county."

meet statutory requirements. [Citations.]' [Citation.]" (*County of San Diego, supra*, 15 Cal.4th at p. 100.)

To ensure that general assistance programs meet statutory requirements, a line of Court of Appeal decisions beginning with *Boehm v. County of Merced* (1985) 163 Cal.App.3d 447, 452-453 [209 Cal.Rptr. 530], held that each county must conduct a specific factual study of its residents' actual subsistence cost of living before setting the amount of general assistance grants. (*Whitfield v. Board of Supervisors* (1991) 227 Cal.App.3d 451, 457-461 [277 Cal.Rptr. 815]; *Guidotti v. County of Yolo* (1989) 214 Cal.App.3d 1552, 1562-1563 [271 Cal.Rptr. 858]; *Poverty Resistance Center v. Hart* (1989) 213 Cal.App.3d 295, 304-305 [271 Cal.Rptr. 214]; *Boehm v. Superior Court* (1986) 178 Cal.App.3d 494, 501-502 [223 Cal.Rptr. 716].) In 1991, however, the Legislature specified a minimum general assistance grant that it deems to be "a sufficient standard of aid." (§ 17000.5, subd. (b).) As originally enacted, section 17000.5, subdivision (a), stated in relevant part: "The board of supervisors in any county may adopt a general assistance standard of aid that is 62 percent of a guideline that is equal to the 1991 federal official poverty line," and that may be adjusted annually by the amount of any adjustment provided under the Aid to Families with Dependent Children (AFDC) program.[4] (Stats. 1991, ch. 91, § 34, p. 488.) By eliminating the requirement that counties undertake *Boehm* studies to determine the actual amount needed for minimum subsistence, the statute provided a safe harbor for counties choosing to adopt this standard of aid. (*Bell v. Board of Supervisors* (1994) 23 Cal.App.4th 1695, 1703-1705 [28 Cal.Rptr.2d 919]; *Oberlander v. County of Contra Costa* (1992) 11 Cal.App.4th 535, 542 [15 Cal.Rptr.2d 182].)

A 1992 amendment to section 17000.5, subdivision (a), clarified that the value of noncash benefits provided by the county may be included in the general assistance standard of aid. The amended subdivision stated in pertinent part: "[A]ny county may adopt a general assistance standard of aid, *including the value of in-kind aid*, that is 62 percent of a guideline that is equal to the 1991 federal official poverty line . . . ." (Stats. 1992, ch. 722, § 139, p. 3498, italics added.) Thus, a county may satisfy its statutory obligation to support and relieve the indigent by providing in-kind aid such as food and shelter, and may reduce general assistance grant levels by the value of in-kind aid that is actually made available. (*Bell v. Board of Supervisors, supra*, 23 Cal.App.4th at pp. 1705-1710; *Oberlander v. County of Contra Costa, supra*, 11 Cal.App.4th at pp. 545-546; see also *Robbins v.*

---

[4]Provisions governing the AFDC program (now referred to as the CalWORKs program) appear in section 11200 et seq.

*Superior Court* (1985) 38 Cal.3d 199, 210 & fns. 15, 16 [211 Cal.Rptr. 398, 695 P.2d 695] [indicating, before the enactment of section 17000.5, that some forms of in-kind aid could be included in general assistance benefits].)

The issue whether the term "in-kind aid" as used in section 17000.5 includes medical care was considered in *Gardner* v. *County of Los Angeles* (1995) 34 Cal.App.4th 200 [40 Cal.Rptr.2d 271]. In *Gardner*, the superior court had denied a motion for a preliminary injunction seeking to preclude the county from reducing its general assistance cash grants by the value it placed upon recipients' participation in a public health plan ($73 per month). The Court of Appeal reversed. After determining that no decisions had required health care to be included in the general assistance standard of aid, that statutes historically had treated health care and general assistance as separate programs, and that medical care had been excluded from the definition of "aid" in other provisions of the Welfare and Institutions Code, the court held that the county could not deduct health care costs from its general assistance grants. The Court of Appeal nevertheless acknowledged that statutes governing general assistance did not address the precise question presented, and that the county could seek legislative changes allowing it to reduce the funds required for general relief to the needy. (*Id.* at pp. 213-227.)

The Legislature acted in 1996 by once again amending section 17000.5, subdivision (a), which in its present form states in relevant part: "[A]ny county may adopt a general assistance standard of aid, including the value of in-kind aid *which includes, but is not limited to, the monthly actuarial value of up to forty dollars ($40) per month of medical care*, that is 62 percent of a guideline that is equal to the 1991 federal official poverty line . . . . *This subdivision is not intended to either limit or expand the extent of the duty of counties to provide health care.*" (Italics added.)[5]

The principal question in the present case is whether providing the standard of aid specified in section 17000.5 satisfies a county's obligation to

[5]Section 17000.5 states in pertinent part:

"(a) The board of supervisors in any county may adopt a general assistance standard of aid, including the value of in-kind aid which includes, but is not limited to, the monthly actuarial value of up to forty dollars ($40) per month of medical care, that is 62 percent of a guideline that is equal to the 1991 federal official poverty line and may annually adjust that guideline in an amount equal to any adjustment provided under [the AFDC program] for establishing a maximum aid level in the county. This subdivision is not intended to either limit or expand the extent of the duty of counties to provide health care.

"(b) The adoption of a standard of aid pursuant to this section shall constitute a sufficient standard of aid.

"(c) For purposes of this section, 'federal official poverty line' means the same as it is defined in subsection (2) of Section 9902 of Title 42 of the United States Code.

provide medical care to its residents, as the County contends, or instead the statute simply specifies the maximum value of medical care that may be deducted as in-kind aid from general assistance cash grants, as real parties in interest (hereafter plaintiffs) maintain.

## B. *Factual and Procedural Background*

In 1966, the State of California began providing health care services to recipients of public assistance and other indigent persons through the California Medical Assistance Program (Medi-Cal). Health care for individuals ineligible for Medi-Cal, but unable to afford medical care, remained the responsibility of the counties pursuant to section 17000. (*County of San Diego, supra,* 15 Cal.4th at pp. 76-77, 100-101.) In 1982, the Legislature excluded from Medi-Cal most individuals who do not fall within the following categories: those at least 65 years of age; blind or disabled persons; and individuals eligible for AFDC. The excluded individuals, referred to as medically indigent persons, meet income and resource eligibility requirements for Medi-Cal, but do not fall within the specified categories. The Legislature transferred state funds to the counties for the purpose of providing health care services to these individuals. (*Id.* at pp. 77-80.)

As a result of the 1982 legislation, the County began providing health care to eligible residents through its County Medically Indigent Services Program (CMISP). Until November 1992, the financial eligibility standard for CMISP was approximately the same as for Medi-Cal. The County provided free health care to individuals with income up to $600 per month. Individuals with income exceeding that amount also were eligible to receive health care through CMISP, but they were required to pay a share of the cost.

Faced with projected budget shortfalls in 1992, the County amended its CMISP financial eligibility standard to be the same as the eligibility standard for general assistance. Under the amended standard, effective November 1, 1992, the County provided no medical care to residents who did not meet the financial eligibility requirements for general assistance, subject to limited exceptions. An individual living alone was eligible for general assistance if his or her income did not exceed $294 per month—an amount equal to 62 percent of the 1991 federal official poverty line. (See § 17000.5, subd. (a).) Individuals financially eligible for general assistance comprised approximately 35 percent of the medically indigent population previously receiving primary health care under CMISP.

"(d) For purposes of this section, 'any adjustment' includes, and, prior to the addition of this subdivision, included statutory increases, decreases, or reductions in the maximum aid level in the county under the [AFDC program].

"(e) In the event that adjustments pursuant to Section 11450.02 are not made, the amounts established pursuant to subdivision (a) may be adjusted to reflect the relative cost of housing in various counties as follows . . . ."

Shortly before the amended CMISP eligibility standard became effective, plaintiffs filed a class action for declaratory and injunctive relief and for a writ of mandate. The individual plaintiffs identify themselves as low-income county residents who rely upon the County for vital health care, such as treatment for cancer, epilepsy, and hypertension, but who are ineligible for health care under the amended standard. The named defendants are Robert S. Caulk (now succeeded by Jim Hunt), in his capacity as the director of the County Department of Health and Human Services; Joseph Sanchez, in his capacity as the director of the County Medical Systems Department; the County Board of Supervisors; and the County. The complaint seeks, among other things, to preclude the County from implementing its amended standard or reducing county health care services below a level adequate to relieve and support all indigent residents. Plaintiffs also moved for a preliminary injunction seeking similar relief pending final resolution of the action.

The trial court granted plaintiffs' motion for a preliminary injunction, precluding the County during the pendency of the action from denying plaintiffs medical services solely because they do not meet the general assistance financial eligibility standard, or any other eligibility standard that fails to consider plaintiffs' financial ability to meet their subsistence medical needs. The County was ordered to provide all individuals who meet the eligibility standards for CMISP in effect before November 1, 1992, with "medical services necessary for the treatment of acute life and limb threatening conditions and emergency medical services . . . ." The trial court further ordered the County to appear at a subsequent hearing and report on the financial eligibility standard the County planned to implement to meet its obligation under section 17000 to provide medical services to indigent county residents.

In January 1993, the County moved to dissolve the preliminary injunction so that it could implement a new eligibility standard. This revised standard, however, was even more restrictive than the previously enjoined standard that limited health care to individuals eligible for general assistance. The County determined that it could satisfy its obligation under section 17000 to provide *all* subsistence needs to the indigent, including medical care, solely by providing general assistance cash grants calculated pursuant to section 17000.5. Thus, under the County's revised standard, even general assistance recipients would be ineligible for health care. Nevertheless, the County, in the exercise of its police power, would continue to provide medical care to general assistance recipients, pending a decision to discontinue such supplemental benefits at some unspecified time in the future.

The County also adopted an alternative, contingent eligibility standard for CMISP, which would become effective only if an adverse final judgment

was entered in the underlying action, and if the contingent standard was judicially approved. Pursuant to this contingent standard, an individual living alone would be ineligible for health care if his or her income exceeded $439 per month. This amount includes the general assistance grant ($294), the County's average per capita cost of providing CMISP health care before November 1992 ($95), and an "income disregard" to account for ancillary medical costs such as transportation and nonprescription medications ($50).

The trial court denied the County's motion to dissolve the injunction. The court observed that the County had deferred implementation of the revised standard and had provided no indication when, if ever, it intended to proceed with implementation. Thus, the trial court stated that the revised standard might not be ripe for a judicial determination of its validity. In any event, the court expressed doubt that the revised standard could be implemented in a manner consistent with the County's obligation to provide medical care to indigent residents. The court further determined that the contingent standard provided no basis for modification of the preliminary injunction. The court observed that under the contingent standard, the County would deny medical services to any resident whose income exceeds $439, whether or not the resident financially is able to obtain treatment for acute life-and-limb-threatening conditions. Consistent with its order granting the motion for preliminary injunction, the trial court expressed its belief that any standard adopted by the County must be predicated upon the actual costs of obtaining subsistence medical care services in the County.

The County petitioned for a writ of mandate to require the superior court to dissolve the preliminary injunction. The Court of Appeal issued an alternative writ but denied the County's application for a stay of the preliminary injunction.[6] More than four years later, the appellate court directed the issuance of a peremptory writ of mandate compelling the trial court to dissolve the preliminary injunction. The Court of Appeal held that the County should have been allowed to implement its revised eligibility standard, because the County may satisfy its statutory obligation to provide health care by either (1) declining to take the $40 credit reflecting the value of in-kind medical care pursuant to section 17000.5, or (2) deducting that sum from general assistance payments and continuing to provide medical care to those eligible for general assistance. Because the County's general assistance grants reflected no deduction for in-kind medical care, the court

---

[6]The County also filed an appeal from the orders granting plaintiffs' motion for a preliminary injunction and denying the County's motion to dissolve the injunction. (Code Civ. Proc., § 904.1, subd. (a)(6) [making such orders immediately appealable].) After issuing the alternative writ, the Court of Appeal suspended proceedings in the appeal, which is still pending.

concluded the County had no statutory obligation to provide medical care to general assistance recipients—or, by implication, to any other residents. Having reached that conclusion, the court found it unnecessary to consider whether the County's contingent eligibility standard would satisfy the obligation under section 17000 to provide medical care to the poor. (*Caulk* v. *Superior Court* (June 27, 1997) No. C015355 (*Caulk I*).)

Less than two months after the decision in *Caulk I* was filed, the Legislature enacted Senate Bill No. 391 (1997-1998 Reg. Sess.) (Senate Bill 391), which among other things added section 17000.51 as an urgency measure. (Stats. 1997, ch. 294, § 84.) This statute expressly refers to *Caulk I* and states that, notwithstanding that decision, the authorization in section 17000.5 for a county to include up to $40 per month of medical care as part of a general assistance grant was not intended to satisfy the county's duty under section 17000 to provide health care services to indigent and dependent poor persons.[7] We subsequently granted plaintiffs' petition for review and transferred the matter to the Court of Appeal with directions to vacate its decision and to reconsider the cause in light of Senate Bill 391.

In *Caulk* v. *Superior Court* (Feb. 27, 1998) No. C015355 (*Caulk II*), the Court of Appeal held that Senate Bill 391 exceeded the Legislature's authority by attempting to instruct the judicial branch regarding the proper interpretation of section 17000.5. The appellate court adhered to its prior decision in *Caulk I* and again directed the issuance of a peremptory writ of mandate compelling the superior court to dissolve the preliminary injunction. The Court of Appeal further directed the superior court to enter judgment for the County.

We again granted plaintiffs' petition for review. The trial court's preliminary injunction remains in effect, as it has throughout these proceedings.

---

[7]Section 17000.51 states:

"(a) Notwithstanding the decision in Caulk v. Superior Court, C015355, June 27, 1997, a county's discretion granted pursuant to Section 17000.5 to include, as part of a general assistance aid grant, in-kind aid with a monthly actuarial value of up to forty dollars ($40) per month of medical care, was not intended, and shall not be construed, to do any of the following:

"(1) Satisfy, in whole or in part, the duty of a county or a city [and] county to provide health care services to indigent and dependent poor persons under Section 17000.

"(2) Permit a county or a city and county to cease providing health care services under Section 17000.

"(3) Affect the eligibility of indigent and dependent poor persons for health care services under Section 17000.

"(b) Subdivision (a) shall cease to be implemented if, and only to the extent that, a final court decision holds that subdivision (a) imposes a state-mandated local program.

"(c) Subdivision (a) confirms, and is declarative of, rather than a change in, existing law, as provided for in Chapter 6 of the Statutes of 1996, which was intended only to provide a county or city and county with the discretion to reduce its general assistance grant level by up to forty dollars ($40) per month."

## II

■ The County contends, and the Court of Appeal held, that a county may satisfy its obligation under section 17000 to furnish health care to indigent residents solely by providing the general assistance standard of aid specified in section 17000.5. Plaintiffs, on the other hand, assert that section 17000.5 has no bearing upon a county's duty to provide health care to its residents who cannot afford it, and that if there was any doubt regarding the proper interpretation of section 17000.5, the Legislature's immediate enactment of section 17000.51 following the decision in *Caulk I* establishes that the Court of Appeal's construction of the statute is erroneous. We agree with plaintiffs' position.

### A. Scope and Standard of Review

As an initial matter, we delineate the scope of our review. In denying the County's motion to dissolve the preliminary injunction, the trial court expressed doubt whether the validity of the County's revised eligibility standard was ripe for judicial review, because the County had not implemented that standard or given any indication when it would do so. We observe, in addition, that the County's contingent eligibility standard would become effective only upon entry of a final adverse judgment in the underlying action, and, as explained below, it is uncertain at this stage of the proceedings whether any such judgment will be entered.

■ As the trial court recognized, the ripeness requirement prevents courts from issuing purely advisory opinions, or considering a hypothetical state of facts in order to give general guidance rather than to resolve a specific legal dispute. (*Pacific Legal Foundation* v. *California Coastal Com.* (1982) 33 Cal.3d 158, 170-171 [188 Cal.Rptr. 104, 655 P.2d 306].) ■ The preliminary injunction, however, precludes the County from denying medical services to any resident solely on the basis of a financial eligibility standard that fails to consider such resident's ability to meet his or her subsistence medical needs. Moreover, the injunction orders the County to appear before the trial court and, in essence, seek approval of any financial eligibility standard the County plans to institute. Accordingly, the issue whether the revised or contingent standard satisfies the County's statutory obligations to provide medical care is ripe for adjudication. Furthermore, the ripeness requirement does not prevent us from resolving a concrete dispute if the consequence of a deferred decision will be lingering uncertainty in the law, especially when there is widespread public interest in the answer to a particular legal question. (*Id.* at p. 170.) Postponing review of the revised and contingent standards would leave uncertain the County's

health care obligations and undoubtedly result in additional, lengthy appellate proceedings.

Our review, however, is limited to the propriety of the preliminary relief granted to plaintiffs. The County's petition for writ of mandate challenges only the trial court's rulings issuing a preliminary injunction and refusing to dissolve the injunction. The record before us discloses no subsequent proceedings in the trial court. The Court of Appeal offered no explanation, justification, or authority, for directing entry of *judgment* for the County. ▮ "The granting or denying of a preliminary injunction does not constitute an adjudication of the ultimate rights in controversy. [Citations.]" (*Cohen* v. *Board of Supervisors* (1985) 40 Cal.3d 277, 286 [219 Cal.Rptr. 467, 707 P.2d 840].) In determining the propriety of preliminary relief, neither the trial court nor an appellate court may undertake a final adjudication of the lawsuit. (*Butt* v. *State of California* (1992) 4 Cal.4th 668, 678, fn. 8 [15 Cal.Rptr.2d 480, 842 P.2d 1240].)[8] Thus, even if the trial court should have denied plaintiffs' motion for a preliminary injunction, the Court of Appeal erred in directing entry of judgment for the County.

The appellate standard for reviewing preliminary injunctions is well established. ▮ In deciding whether to issue a preliminary injunction, a trial court weighs two interrelated factors: the likelihood the moving party ultimately will prevail on the merits, and the relative interim harm to the parties from the issuance or nonissuance of the injunction. (*Butt* v. *State of California, supra,* 4 Cal.4th at pp. 677-678.) "Generally, the ruling on an application for a preliminary injunction rests in the sound discretion of the trial court. The exercise of that discretion will not be disturbed on appeal absent a showing that it has been abused. [Citations.]" (*Cohen* v. *Board of Supervisors, supra,* 40 Cal.3d at p. 286.) "A trial court may not grant a preliminary injunction, regardless of the balance of interim harm, unless there is some possibility that the plaintiff would ultimately prevail on the merits of the claim. [Citation.]" (*Butt* v. *State of California, supra,* 4 Cal.4th at p. 678.) The injunction is reviewed under the law in effect at the time the appellate court renders its opinion. (*Tulare Dist.* v. *Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489, 526-528 [45 P.2d 972]; *Oberlander* v. *County of Contra Costa, supra,* 11 Cal.App.4th at p. 538.)

Neither the County nor the Court of Appeal has disagreed with the trial court's determination that, absent a preliminary injunction, plaintiffs would be without medical services essential to the control and treatment of life-threatening conditions, and that when weighed against the financial burden

---

[8]Compare *Camp* v. *Board of Supervisors* (1981) 123 Cal.App.3d 334, 357-358 [176 Cal.Rptr. 620] (permanent injunctive relief may be granted without a trial if there is a stipulation or other satisfactory showing that warrants submitting the cause on the merits).

on the County resulting from a preliminary injunction, the balance of hardships favors plaintiffs. The Court of Appeal directed the trial court to dissolve the preliminary injunction after concluding that plaintiffs have no likelihood of success on the merits, and that the trial court thus could have exercised its discretion in only one manner—by denying the application for a preliminary injunction. We shall proceed to determine whether the appellate court correctly assessed the probable merit of plaintiffs' action.

### B. *The Effect of Section 17000.5 Upon the Obligation of Counties to Provide Health Care*

 Section 17000.5, subdivision (a), states in relevant part: "[A]ny county may adopt a general assistance standard of aid, including the value of in-kind aid which includes, but is not limited to, the monthly actuarial value of up to forty dollars ($40) per month of medical care, that is 62 percent of a guideline that is equal to the 1991 federal official poverty line . . . . This subdivision is not intended to either limit or expand the extent of the duty of counties to provide health care."

The County contends that, by including medical care within section 17000.5's standard of aid, the Legislature "defined the [s]ection 17000 population to whom the County owes a duty to provide health care once [s]ection 17000.5's safe harbor has been invoked." In other words, according to the County, section 17000.5 permits counties to limit medical care to those residents eligible for general assistance, and to satisfy its obligation to provide medical care to that limited class of residents either by furnishing such care and deducting $40 from general assistance grants, or simply by declining to take the $40 deduction. Plaintiffs, on the other hand, assert that the County's construction of section 17000.5 is unsupported by the language of the statute and conflicts with the last sentence of subdivision (a), which expressly states that the statute was not intended to limit a county's duty to provide health care under section 17000.

 Our role in construing a statute is to ascertain the Legislature's intent so as to effectuate the purpose of the law. (*People* v. *Snook* (1997) 16 Cal.4th 1210, 1215 [69 Cal.Rptr.2d 615, 947 P.2d 808].) In determining intent, we look first to the words of the statute, giving the language its usual, ordinary meaning. If there is no ambiguity in the language, we presume the Legislature meant what it said, and the plain meaning of the statute governs. (*Ibid.*) The words, however, must be read in context, considering the nature and purpose of the statutory scheme. (*Torres* v. *Automobile Club of Southern California* (1997) 15 Cal.4th 771, 777 [63 Cal.Rptr.2d 859, 937 P.2d 290].)

 Section 17000.5, subdivision (a), provides that a county "may adopt a general assistance standard of aid, including the value of in-kind aid which

includes, but is not limited to, the monthly actuarial value of up to forty dollars ($40) per month of medical care . . . ." The statute specifies that the *value* of in-kind aid may be included in the general assistance standard of aid. The statute further provides that this value of in-kind aid includes a portion of the actuarial value of medical care, thereby clarifying that medical care is among the types of in-kind aid that may be included for this purpose. (See *Gardner* v. *County of Los Angeles, supra,* 34 Cal.App.4th at pp. 213-227 [reaching a contrary conclusion before the 1996 amendment to section 17000.5].) Read in context, the reference in subdivision (a) to $40 per month places a cap upon the value of in-kind medical care that may be included in the general assistance standard of aid. Contrary to the County's assertion, nothing in the actual language of section 17000.5, subdivision (a), either establishes the level of medical care that a county must provide to its residents or defines the class of residents eligible for such care. The last sentence of section 17000.5, subdivision (a), affirmatively demonstrates that the absence of any such language reflects a legislative purpose to preclude the interpretation advanced by the County: "This subdivision is not intended to either limit or expand the extent of the duty of counties to provide health care." Accordingly, a county's duty to provide health care remains the same as it existed before the 1996 amendment to section 17000.5 added the reference to medical care. After the effective date of the amendment, however, a county may include the value of the medical care it provides, up to a maximum of $40 per month, in the general assistance standard of aid calculated pursuant to section 17000.5.

The Court of Appeal agreed with the County's position that the plain language of section 17000.5 establishes the full extent of the obligation of counties to provide health care. In reaching this conclusion, the Court of Appeal stated in full: "Prior appellate decisions have established that a county may satisfy its section 17000 obligations through grants computed according to the formula described in section 17000.5 or, in whole or in part, through in-kind aid. [Citation.] Revised section 17000.5 establishes that in-kind aid 'includes, but is not limited to, the monthly actuarial value of up to forty dollars ($40) per month of medical care.' Hence, as with other types of in-kind aid, counties may either discontinue medical care for those receiving GA [general assistance] benefits set according to section 17000.5 or continue to provide such [benefits] and deduct up to $40 from the GA grant levels. There is no other reasonable interpretation. The concluding sentence of section 17000.5, subdivision (a), which indicates the subdivision 'is not intended to either limit or expand the extent of the duty of counties to provide health care[,]' merely explains that section 17000.5 does not define the counties' duty to provide health care but provides an alternate means of satisfying it."

As set forth above, we discern a different—and, in our view, more reasonable—interpretation of section 17000.5, subdivision (a). By selectively quoting from the statute, the Court of Appeal determined that this provision "establishes that in-kind aid 'includes . . . up to forty dollars ($40) per month of medical care.' " From this premise, the Court of Appeal concluded that payment of $40 representing in-kind medical care completely satisfies a county's statutory obligation to provide medical care. The statute, however, does not establish what "in-kind aid 'includes.' " Rather, it establishes what the general assistance standard of aid may include; it is the *value* of in-kind aid that may be included in calculating general assistance payments pursuant to this section. Furthermore, the statute's reference to $40 per month does not establish the extent of a county's obligation to provide medical care, as the Court of Appeal determined, but rather specifies the *maximum value* of in-kind medical aid that may be included in the general assistance standard of aid and deducted from the cash grants.

The Court of Appeal's statement that the last sentence of subdivision (a) "merely explains that section 17000.5 does not define the counties' duty to provide health care but provides an alternate means of satisfying it," is internally inconsistent. If section 17000.5 specified that a county could satisfy its duty to provide health care by including $40 per month in its general assistance standard of aid, the statute would define the county's duty to provide health care. Indeed, the County contends that its adoption of the standard of aid set forth in section 17000.5, subdivision (a), "satisfies the totality of the [County's] Section 17000 obligation" to furnish medical care. By adding the last sentence to subdivision (a), however, the Legislature expressly and clearly disclaimed any intention that section 17000.5 would affect the duty of counties to provide health care. The Court of Appeal's interpretation renders this sentence surplusage, in contravention of the principle that, if possible, significance should be given to every word, phrase, sentence, and part of a statute. (*Woosley* v. *State of California* (1992) 3 Cal.4th 758, 775-776 [13 Cal.Rptr.2d 30, 838 P.2d 758].)

The County further contends that subdivision (b) of section 17000.5 establishes the scope of its obligation to provide health care pursuant to section 17000. This subdivision states: "The adoption of a standard of aid pursuant to [section 17000.5] shall constitute a sufficient standard of aid." The only standard of aid to which section 17000.5 refers, however, is a *general assistance* standard of aid. (§ 17000.5, subd. (a).) Our decision in *County of San Diego, supra*, 15 Cal.4th at pages 92-104, makes clear that a county's duty to provide medical care pursuant to section 17000 is independent of other obligations imposed by that section, including the obligation to pay general assistance. In *County of San Diego*, because the state had

relieved counties of their obligation under section 17000 to provide health care to medically indigent persons, but subsequently had transferred that responsibility back to the counties, we held that the state had mandated a new program or higher level of service (Cal. Const., art. XIII B, § 6), and that the state accordingly was required to reimburse the counties for the costs of that program. (15 Cal.4th at pp. 75-76, 92-99.) General assistance, on the other hand, always has been the responsibility of the counties. (*Mooney* v. *Pickett, supra*, 4 Cal.3d at pp. 677-680.) Our conclusion in *County of San Diego* that the counties' obligation to provide health care to medically indigent persons pursuant to section 17000 was an unfunded state mandate directly conflicts with the County's unsupported assertion that general assistance is the only type of aid required by section 17000. (See also *Tailfeather* v. *Board of Supervisors* (1996) 48 Cal.App.4th 1223, 1234 [56 Cal.Rptr.2d 255] ["The courts have uniformly concluded that section 17000's reference to the counties' duty to 'relieve and support' indigents includes a requirement for provision of medical care. [Citations.]"].)[9]

The County maintains that the *County of San Diego* decision offers no support for plaintiffs' position in the present case, because our opinion did not consider the effect of section 17000.5. As we have explained, however, section 17000.5, by its terms, is limited to general assistance. Our conclusion in *County of San Diego* that counties have an obligation to provide *medical care* to all medically indigent persons specifically was "limited to this aspect of a county's duty under section 17000. We express[ed] no opinion regarding the scope of a county's duty to provide other forms of relief and support under section 17000." (*County of San Diego, supra*, 15 Cal.4th at p. 101, fn. 24.) Thus, our failure to consider section 17000.5 was not an oversight, but rather an implicit recognition that this statute has no bearing upon a county's duty to provide health care to its residents.[10]

---

[9]The language appearing in section 17000.5, subdivision (b), is repeated in substance in section 17000.6, which permits a county to adopt a standard of aid below the level established in section 17000.5 if the Commission on State Mandates finds that compliance with section 17000.5 would result in significant financial distress. (§ 17000.6, subd. (a).) Section 17000.6, subdivision (e), states: "Any standard of aid adopted pursuant to this section shall constitute a sufficient standard of aid." Subdivision (d) of section 17000.6, however, states: "This section shall not be construed to eliminate the requirement that a county provide aid *pursuant to Section 17000*." (Italics added.) If the general assistance standard of aid referred to in sections 17000.5 and 17000.6 encompassed the full extent of a county's obligations pursuant to section 17000, there would have been no reason for the Legislature to include subdivision (d) in section 17000.6.

[10]The brief of amici curiae Counties of San Diego and Tulare asserts that section 17000.5 was irrelevant to our decision in *County of San Diego*, because we considered a county's claim for reimbursement only for fiscal years 1989-1990 and 1990-1991—prior to the enactment of section 17000.5. The judgment we reviewed in that case, however, concerned both the state's reimbursement for the county's previous expenditures and the state's

The decision in *County of San Diego* and the cases cited therein establish that section 17000 gives counties no discretion to refuse to provide medical care to adult medically indigent persons—defined, for purposes of that decision, as most individuals who meet financial eligibility requirements for Medi-Cal but are not at least 65 years of age, blind, disabled, or eligible for AFDC. (*County of San Diego, supra*, 15 Cal.4th at pp. 77-80, 100-104.) Because such medically indigent persons are not necessarily eligible for general assistance, there is no merit in the County's contention that section 17000.5 permits the County to limit the provision of medical care only to those individuals eligible for general assistance.

Recognizing that *County of San Diego* undermines its position, the County simply respectfully disagrees with our unanimous conclusion in that case that counties must provide medical care to medically indigent adults pursuant to section 17000, independent of the statutory scheme that transferred responsibility for such individuals from the state to the counties in 1982. The County's disagreement is based upon the circumstance that the Legislature deemed the class of medically indigent adults to be distinct from the historical section 17000 population. This circumstance does not support the County's position, however, but rather clarifies that section 17000 always has required counties to provide health care to those individuals who are not relieved or supported by other means.

As our decision in *County of San Diego* repeatedly emphasizes after exhaustive analysis, the Legislature's various definitions of "medically indigent" under state welfare programs never were intended to include all individuals to whom counties must provide health care pursuant to section 17000. (*County of San Diego, supra*, 15 Cal.4th at pp. 100-104.) "[T]he 1982 legislation can be viewed as having mandated an increase in the services that counties were providing through existing section 17000 programs, by adding adult [medically indigent persons] *to the indigent population that counties already had to serve under that section*. [Citation.]" (*Id.* at p. 98, fn. 19, italics added; see also *id.* at pp. 114-115 (dis. opn. of Kennard, J.) ["The counties' legal obligation to provide medical care arises from section 17000, not from the subsequently enacted 1982 legislation."].) "[O]ur discussion demonstrates the Legislature excluded adult [medically indigent persons] from Medi-Cal *knowing* and *intending* that the 1982 legislation would trigger the counties' responsibility to provide medical care as providers of last resort under section 17000." (*Id.* at p. 98, original italics.) "[T]he Legislature has always viewed all adult [medically indigent persons] as 'indigent persons' within the meaning of section 17000 for medical care purposes." (*Id.* at p.

continuing obligation to fund the county's health care program. (15 Cal.4th at pp. 84-85.) Our holding was not limited to the pre-1992 health care obligations of counties.

102.) " 'Section 17000, as authoritatively interpreted, mandates that medical care be provided . . . promptly and humanely. The duty is mandated by statute. There is no discretion concerning whether to provide such care . . . .' [Citation.]" (*Id.* at p. 104.)

Contrary to the County's urging, we do not believe it would be appropriate to disregard authoritative, settled statutory interpretation that was central to the analysis and holding of one of our decisions. ■ (See *People v. Latimer* (1993) 5 Cal.4th 1203, 1213 [23 Cal.Rptr.2d 144, 858 P.2d 611] [" 'Considerations of *stare decisis* have special force in the area of statutory interpretation, for . . . [the Legislature] remains free to alter what we have done.' [Citations.]"].) The County has advanced no persuasive contention that our conclusion in *County of San Diego* is erroneous. ■ Accordingly, consistent with established authority, the scope of the County's obligation to provide health care to indigent residents is defined by section 17000—not section 17000.5.

Even if there were some ambiguity in the language of section 17000.5 that would permit us to examine extrinsic aids to ascertain its meaning, nothing in the legislative history of the statute suggests that it was intended to affect a county's health care obligations under section 17000. The Legislative Counsel's Digest of the Senate bill amending section 17000.5 in 1996, to refer to medical care, states: "Existing law authorizes the board of supervisors in any county to adopt *a general assistance standard of aid*, including the value of in-kind aid. [¶] This bill would provide that the value of in-kind aid includes, but is not limited to, the value of specified amounts of medical aid and care." (Legis. Counsel's Dig., Sen. Bill No. 681 (1995-1996 Reg. Sess.), italics added.) Similarly, the Senate Floor Analysis states: "This bill allows counties various options to reduce their *General Assistance Cash Grant costs*. [¶] A. Provides that the value of in-kind assistance aid, which a board of supervisors may adopt within its *general assistance standard of aid* includes, but is not limited to, the value of up to $40 per month of medical care. . . ." (Sen. Rules Com., Analysis of Sen. Bill No. 681 (1995-1996 Reg. Sess.) Jan. 30, 1996, p. 5, italics added.) These descriptions of the bill are consistent with our determination that section 17000.5 concerns only the calculation of general assistance grants, not the scope of the obligation to provide health care. Contrary to the County's position, the circumstance that the Legislature has changed the mechanism for providing funds to counties and has afforded counties some measure of financial relief by reducing their welfare obligations in other areas does not establish that it intended to limit public health care services in the manner suggested by the County.

The provisions of law regarding a public assistance program must be "fairly and equitably construed to effect the stated objects and purposes of

the program." (§ 11000.) Our construction of section 17000.5 furthers the objectives of the statutory scheme governing indigent relief—to provide for the protection, care, and assistance of *all* the needy and distressed people of the state, and to administer appropriate aid and services promptly and humanely. (§ 10000.) If a county had discretion to refuse to provide medical care to any individual who is not financially eligible for general assistance, or who is receiving general assistance payments without a $40 reduction for in-kind medical care, a significant number of its residents who do not qualify to receive health services from other sources would lack medically necessary care. Under the County's amended CMISP eligibility standard that was enjoined by the trial court, approximately 65 percent of the residents previously eligible for primary health care services offered by the County through CMISP would receive no medical care from the County. Under the County's revised standard, the County could choose to discontinue providing medical services to *all* of the residents previously eligible for CMISP. In our view, the Legislature would not have made such a sweeping change in the scope of counties' obligations pursuant to section 17000 without a clear expression of an intention to do so. No such expression of purpose is reflected in section 17000.5 or its legislative history.[11]

Accordingly, we conclude that the Court of Appeal erred in determining that the County may satisfy its duty to provide health care by limiting eligibility for CMISP to those individuals eligible for general assistance (the November 1992 amended standard), or by declining to reduce its general assistance standard of aid by $40 and providing no health care to any of its indigent residents (the January 1993 revised standard). Therefore, the appellate court also erred in concluding that plaintiffs have no likelihood of success on the merits of their claims. The trial court acted within its discretion in issuing a preliminary injunction prohibiting the County from implementing either the amended or the revised standard.

C. *The Effect of Section 17000.51 Upon the Interpretation of Section 17000.5*

 Even if there were some doubt whether section 17000.5 limited the obligation of counties to provide health care pursuant to section 17000, the Legislature's enactment of section 17000.51 following the *Caulk I* decision unmistakably establishes that nothing in section 17000.5 affects that obligation. Contrary to the County's contention and the Court of Appeal's decision

---

[11]In response to questions posed by the court at oral argument, the parties were unable to identify any other California county that has acted to restrict eligibility for medical care in a manner consistent with the County's interpretation of section 17000.5. Only two counties— amici curiae San Diego and Tulare Counties—have supported the County's position in this court.

in *Caulk II*, the Legislature's clarification of its intent underlying section 17000.5 does not violate the separation of powers doctrine. (Cal. Const., art. III, § 3.)[12]

Section 17000.51, subdivision (a), states: "Notwithstanding the decision in [*Caulk I*], a county's discretion granted pursuant to Section 17000.5 to include, as part of a general assistance grant, in-kind aid with a monthly actuarial value of up to forty dollars ($40) per month of medical care, was not intended, and shall not be construed, to do any of the following: [¶] (1) Satisfy, in whole or in part, the duty of a county or a city [and] county to provide health care services to indigent and dependent poor persons under Section 17000. [¶] (2) Permit a county or a city and county to cease providing health care services under Section 17000. [¶] (3) Affect the eligibility of indigent and dependent poor persons for health care services under Section 17000."

Section 17000.51, subdivision (c), states: "Subdivision (a) confirms, and is declarative of, rather than a change in, existing law, as provided for in [the 1996 amendment to section 17000.5], which was intended only to provide a county or city and county with the discretion to reduce its general assistance grant level by up to forty dollars ($40) per month."

The Court of Appeal determined that the Legislature's enactment of section 17000.51 was ultra vires because this statute did not amend section 17000.5, but rather "presumes to explain what was intended by the 1996 amendment" to section 17000.5. According to the Court of Appeal, "[s]uch post hoc interpretation by a reconstituted Legislature violates fundamental principles of separation of powers. . . . The Legislature may not tell the courts how a statute must be interpreted any more than the courts may tell the Legislature what to enact." The Court of Appeal expressed its belief that the interpretation of section 17000.5 set forth in section 17000.51 is "wrong" and reiterated the construction of section 17000.5 set forth in its decision in *Caulk I*.

We agree that statutory interpretation is an exercise of the judicial power assigned to the courts by the Constitution, and that a subsequent legislative declaration as to the meaning of a preexisting statute is neither binding nor conclusive in construing the statute's application to past events. (*Western Security Bank* v. *Superior Court* (1997) 15 Cal.4th 232, 244 [62 Cal.Rptr.2d 243, 933 P.2d 507].) "Nevertheless, the Legislature's expressed

---

[12]"The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." (Cal. Const., art. III, § 3.)

views on the prior import of its statutes are entitled to due consideration, and we cannot disregard them. [¶] '[A] subsequent expression of the Legislature as to the intent of the prior statute, although not binding on the court, may properly be used in determining the effect of a prior act.' [Citation.]" (*Ibid.*)

■ Section 17000.51 was enacted and became effective as an urgency measure less than two months after the *Caulk I* decision was filed, and less than nine months after the 1996 amendment to section 17000.5 became effective. Unlike the circumstance in which one Legislature declares the intent of an earlier Legislature's enactment "when a gulf of decades separates the two bodies" (*Western Security Bank* v. *Superior Court, supra,* 15 Cal.4th at p. 244), there is no incongruity in our considering the prompt legislative response in the present case. (*Briggs* v. *Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1119-1121 [81 Cal.Rptr.2d 471, 969 P.2d 564] [considering prompt legislative amendment of a statute in response to Court of Appeal decisions].)

Nor does section 17000.51 represent a legislative attempt to discard the outcome or readjudicate the merits of a particular judicial proceeding. ■ "[T]he Legislature . . . does not possess the authority to review or to readjudicate *final* court judgments on a case-by-case basis. The recognition of such legislative authority would completely deprive court judgments of the respect and deference which the Constitution contemplates each branch of government will accord to *final* actions within the jurisdiction of a coequal branch, and would repose in the Legislature a combination of powers that the constitutional draftsmen specifically intended to forestall." (*Mandel* v. *Myers* (1981) 29 Cal.3d 531, 549 [174 Cal.Rptr. 841, 629 P.2d 935], fn. omitted, italics added.) ■ As explained previously, however, the only question before the Court of Appeal and this court is whether the trial court erred in granting a preliminary injunction. Because injunctive relief operates prospectively, a reviewing court must apply the law in effect at the time its opinion is rendered. (*Oberlander* v. *County of Contra Costa, supra,* 11 Cal.App.4th 535, 538.) "The rationale of this rule is that it would be an idle act for [an appellate court] to determine what the county must do in the future under the law as it used to be but no longer is." (*Ibid.*; cf. *Kuykendall* v. *State Bd. of Equalization* (1994) 22 Cal.App.4th 1194, 1206-1207 [27 Cal.Rptr.2d 783] [If a superior court judgment is not yet final because it is on appeal, the separation of powers doctrine does not prevent the Legislature from changing the law to be applied when the appellate court renders its decision.].)

The County acknowledges that the Legislature has the power to alter the provisions of existing law by enacting clarifying legislation. The County

contends, however, that section 17000.51 was not adopted for the purpose of affirmatively imposing any standard of aid regarding medical care, but rather solely to ascribe a post hoc legislative intent to section 17000.5. According to the County, the Legislature instead should have amended section 17000.5 "to provide that counties must provide medical care in addition to [s]ection 17000.5's monetary grant [or] to expressly provide the monetary grant did not abrogate the counties' duty to provide health care services to the medically indigent." The Legislature's decision to add section 17000.51, instead of amending existing statutes, is understandable, however. Section 17000.5, subdivision (a), already stated: "This subdivision is not intended to either limit or expand the extent of the duty of counties to provide health care." The additional provisions proposed by the County would have been redundant.

In any event, long ago we rejected an argument—similar to the one advanced by the County and adopted by the Court of Appeal—that a separate legislative enactment that explains the meaning of a statute, rather than amends the original statute, cannot affect the judiciary's interpretation of the law. In *Matter of Coburn* (1913) 165 Cal. 202 [131 P. 352], we considered a new section in the Code of Civil Procedure defining the term "incompetent" for purposes of guardianship proceedings. In rejecting a constitutional challenge to the statute, we stated: "The first point made against the validity of [the statute] is that the act adding the section to the code is an attempted exercise by the legislative branch of the government of a power belonging exclusively to the judiciary; the power, that is to say, of interpreting a pre-existing statute. The appellant quotes, in support of his position, this passage from [a treatise]: 'If the legislature would prescribe a different rule for the future from that which the courts enforce, it must be done by statute and cannot be done by a mandate to the courts which leaves the law unchanged, but seeks to compel the courts to construe and apply it, not according to the judicial, but according to the legislative judgment.' [Citation.] . . . The weight of authority supports what we think to be the true rule, i.e., that such declaratory or defining statutes are to be upheld, except with regard to past transactions, as an exercise of the legislative power to enact a law for the future." (*Id.* at pp. 209-210.)

We recently reiterated this principle in *DeVita* v. *County of Napa* (1995) 9 Cal.4th 763 [38 Cal.Rptr.2d 699, 889 P.2d 1019]. In *DeVita*, the plaintiffs contended that a statute enacted in 1987 should not be considered in construing land use planning laws enacted by earlier Legislatures. They relied upon *Del Costello* v. *State of California* (1982) 135 Cal.App.3d 887, 893, footnote 8 [185 Cal.Rptr. 582], which states: "The Legislature has no authority to interpret a statute. That is a judicial task." In distinguishing *Del*

*Costello*, we observed that the Court of Appeal in that case had "relied on the obvious proposition that a Legislature could not state definitively the meaning of a statute enacted by a previous Legislature so as to give it *retroactive* application. *Del Costello* did not suggest that the Legislature was barred from enacting a statute that would *prospectively* clarify or supplement a previously enacted statute. [Citation.]" (*DeVita* v. *County of Napa, supra,* 9 Cal.4th at p. 778, first italics added, second italics in original.) Because all relevant events at issue in *DeVita* had occurred after the 1987 statute was enacted, we determined that we properly could consider that statute in construing the earlier enacted planning laws. (*Ibid.*)

■ Accordingly, even if section 17000.5 were susceptible to the interpretation set forth in *Caulk I*, the Legislature's enactment of section 17000.51, declaring a different intent regarding section 17000.5, is to be upheld as an exercise of the legislative power to enact a law for the future, and governs here because we are concerned with the propriety of injunctive relief, which operates prospectively.

■ The County contends that, even if section 17000.51 is valid, counties still may limit eligibility for medical care to those individuals eligible for general assistance under section 17000.5. According to the County, section 17000.51 simply clarifies that counties may deduct up to $40 per month from general assistance grants, but that they may not cease providing medical care to general assistance recipients. We disagree with this construction of the statute. Section 17000.51, subdivision (c), states that the 1996 amendment to section 17000.5 "was intended *only* to provide a county . . . with the discretion to reduce its general assistance grant level by up to forty dollars ($40) per month." (Italics added.) Because this intention was the only purpose of the amendment, eligibility for medical care pursuant to section 17000 remains unaffected by the amendment. Thus, section 17000.51 confirms that the Legislature's reference to medical care in section 17000.5 does not authorize counties to restrict eligibility for medical care to those individuals eligible for general assistance.

D. *The Validity of the County's Contingent Eligibility Standard*

As explained previously, in the trial court the County moved to dissolve the preliminary injunction to permit implementation of either the revised or contingent CMISP eligibility standard. Under the contingent standard, an individual living alone would be ineligible for health care if his or her income exceeded $439 per month. The trial court refused to dissolve the injunction to permit the County to implement the contingent standard, because the court deemed this standard to be unrelated to individual residents' financial ability to obtain subsistence medical services.

In assessing the legality of the County's contingent standard, the trial court observed that no provision similar to section 17000.5 sets forth a formula that counties may utilize in determining the scope of medical care services required by section 17000. The County's contingent standard is based upon a formula using the general assistance standard of aid and the average per capita cost of providing all indigent medical care in the County, and excludes from the County's medical care obligation any resident whose income equals or exceeds $439—regardless whether the resident financially will be able to obtain subsistence medical care. According to the trial court, this standard therefore lacks a factual basis and is unreasonable. Although the court declined to preclude *any* standard based upon a flat amount of income, it stated that the County's eligibility standard must be predicated factually upon individual residents' financial ability to pay the actual costs of obtaining subsistence medical care, which the trial court defined as "medical services necessary for the treatment of acute life and limb threatening conditions and emergency medical services within the meaning of Health and Safety Code section 1317."[13]

The County asserts that the trial court's conclusion divests the County of its legislative discretion to establish financial eligibility standards for section 17000 assistance. The County relies upon Health and Safety Code section 1445, which states in relevant part: "Under such limitations and restrictions as are prescribed by law, . . . the boards of supervisors in each county . . . may provide medical and dental care and health services and supplies to persons in need thereof who are unable to provide the same for themselves . . . . Each county may, insofar as it is able to do so, provide the means to meet promptly and adequately the health needs of the indigent sick . . . ." (See also § 17107 [counties may establish their own policies regarding the amount of property an individual shall be permitted to have while receiving assistance].) According to the County, Health and Safety Code section 1445 is permissive and provides that a county, in the exercise of its discretion, *may* provide for unmet medical need, but only if it chooses to do so.

---

[13]Health and Safety Code section 1317 states in relevant part: "(a) Emergency services and care shall be provided to any person . . . for any condition in which the person is in danger of loss of life, or serious injury or illness, at any health facility . . . that maintains and operates an emergency department . . . . [¶] (b) In no event shall the provision of emergency services and care be based upon, or affected by, the person's . . . insurance status, economic status, or ability to pay for medical services . . . ."

Health and Safety Code section 1317.1 defines "emergency services and care" as the care, treatment, and surgery necessary to relieve or eliminate a "medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in any of the following: [¶] (1) Placing the patient's health in serious jeopardy. [¶] (2) Serious impairment to bodily functions. [¶] (3) Serious dysfunction of any bodily organ or part."

The County's position finds some support in *Bay General Community Hospital* v. *County of San Diego* (1984) 156 Cal.App.3d 944, 953, 959-960 [203 Cal.Rptr. 184] (*Bay General*), which relied in part upon Health and Safety Code section 1445 in concluding that counties have broad discretion in setting standards for the provision of medical care under section 17000. In *County of San Diego*, *supra*, 15 Cal.4th 68, however, we expressly disapproved of *Bay General* "insofar as it (1) states that a county's responsibility under section 17000 extends only to indigents as defined by the county's board of supervisors, and (2) suggests that a county may refuse to provide medical care to persons who are 'indigent' within the meaning of section 17000 but do not qualify for Medi-Cal." (15 Cal.4th at p. 101, fn. 23.) Our decision states unequivocally: "[C]ounties have *no* discretion to refuse to provide medical care to 'indigent persons' within the meaning of section 17000 who do not receive it from other sources. [Citations.]" (*Id.* at p. 101, fn. omitted, italics added.)

In any event, Health and Safety Code section 1445 confers discretion upon counties to provide medical care "[*u*]*nder such limitations and restrictions as are prescribed by law . . . .*" (Italics added.) Although we had no occasion in *County of San Diego* to determine the precise contours of the obligation of counties to provide medical care pursuant to section 17000, we held that this obligation extends *at least* as far as the class of all adult medically indigent persons—those individuals who are not aged, blind, disabled, or eligible for AFDC, and who before 1982 would have qualified for Medi-Cal. (*County of San Diego*, *supra*, 15 Cal.4th at p. 104.) The County's contingent standard would render a significant portion of this class of individuals ineligible for health care. The standard therefore fails to satisfy the County's obligations under section 17000.

■ Moreover, we agree with the trial court that the contingent standard is invalid because it fails to take into account the financial ability of residents to obtain subsistence medical care. Although section 17000.5 relieved counties of the obligation of calculating general assistance grants based upon actual need, no similar provision allows counties to adopt an eligibility standard for the receipt of medical care that is not based upon actual subsistence needs. A number of decisions support the conclusion that a county may not condition the receipt of health care upon a financial eligibility standard that fails to consider individual residents' ability to obtain necessary care.

In *County of San Diego*, we observed that the fate of amendments to section 17000 proposed in 1971 suggests that the category of individuals entitled to medical care under that statute extends beyond medically indigent

persons who previously were eligible for Medi-Cal. One proposal would have added the following italicized language to section 17000: "Every county . . . shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by [other means], *however, the health needs of such persons shall be met under [Medi-Cal]*." (Assem. Bill No. 949 (1971 Reg. Sess.) § 53.3, as amended June 17, 1971.) The proposed amendment ultimately was deleted, however, and the Assembly Committee on Health explained: "The proposed amendment to Section 17000, . . . which would have removed the counties' responsibilities as health care provider of last resort, . . . is deleted since it cannot remove the fact that counties are, by definition, a 'last resort' for any person, with or without the means to pay, who does not qualify for federal or state aid." (Assem. Com. on Health, Analysis of Assem. Bill No. 949 (1971 Reg. Sess.) as amended July 20, 1971, p. 4.)

Consistent with this explanation, the Attorney General subsequently concluded: "The definition of medically indigent in [the chapter establishing Medi-Cal] is applicable only to that chapter and does not include all those enumerated in section 17000. If the former medical care program, by providing care only for a specific group, public assistance recipients, did not affect the responsibility of the counties to provide such service under section 17000, we believe the most recent expansion of the medical assistance program does not affect, absent an express legislative intent to the contrary, the duty of the counties under section 17000 to continue to provide services to those eligible under section 17000 but not under [Medi-Cal]." (56 Ops.Cal.Atty.Gen. 568, 570 (1973).) As we explained in *County of San Diego, supra*, 15 Cal.4th at page 104, "[a]bsent controlling authority, [the Attorney General's opinion] is persuasive because we presume that the Legislature was cognizant of the Attorney General's construction of section 17000 and would have taken corrective action if it disagreed with that construction. [Citation.]"

Historically, individuals eligible for medical care under section 17000, but not under other specialized aid programs, have been persons with insufficient means to pay for subsistence medical care. (*County of San Diego, supra*, 15 Cal.4th at pp. 102-103 [For purposes of a county's duty to provide residents with hospitalization, prior judicial decisions have defined the term "indigent person" as an individual " 'who has insufficient means to pay for his maintenance in a private hospital after providing for those who legally claim his support.' [Citation.]"]; *Tailfeather* v. *Board of Supervisors, supra*, 48 Cal.App.4th at p. 1240 ["[A] long line of precedent hold[s] that section 17000 requires provision of medical services to the poor at a level which

does not lead to unnecessary suffering or endanger life and health . . . ."]; *Cooke* v. *Superior Court* (1989) 213 Cal.App.3d 401, 413-415 [261 Cal.Rptr. 706], disapproved on another point in *County of San Diego, supra,* 15 Cal.4th at p. 106, fn. 30 [Sections 10000 and 17000 require counties to provide humane health care, including care sufficient to avoid substantial pain and infection.]; *County of San Diego* v. *Viloria* (1969) 276 Cal.App.2d 350, 352-353 [80 Cal.Rptr. 869] [Section 17000 requires counties to furnish hospitalization to indigent persons, who are liable for a share of the cost only to the extent of their ability to pay.].) Indeed, in *County of San Diego,* we disapproved *Bay General, supra,* 156 Cal.App.3d at pages 958-960, because the Court of Appeal had determined that a county could meet its section 17000 obligation by implementing a financial eligibility standard excluding individuals whose income rendered them ineligible for Medi-Cal, but who nevertheless were unable to pay for medical care.

No subsequent legal developments have altered this established standard of eligibility for medical care under section 17000. Every county, as the provider of last resort, "shall relieve and support all . . . those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by [other means]." (§ 17000.) Accordingly, in determining a financial eligibility standard for county health services pursuant to section 17000, the County must consider whether implementation of the standard would leave some residents who are incapacitated by age, disease, or accident, and whose condition is not relieved through other means, without subsistence medical care. Although we have no occasion in the present case to determine the specific medical services a county must offer to provide residents with subsistence medical care pursuant to section 17000, that obligation extends at least as far as the trial court determined in granting the preliminary relief sought by plaintiffs—medical services necessary for the treatment of acute life-and-limb-threatening conditions and emergency medical services within the meaning of Health and Safety Code section 1317.

Contrary to the County's assertion, recognizing such an obligation neither requires the County to satisfy all unmet needs, nor mandates universal health care. Indeed, the County states that the standard set forth in the preliminary injunction has permitted a 20 percent *reduction* in the County's primary health care caseload. The Legislature has eliminated any requirement that counties provide the same quality of health care to residents who cannot afford to pay as that available to nonindigent individuals receiving health care services in private facilities. (*Tailfeather* v. *Board of Supervisors, supra,* 48 Cal.App.4th at pp. 1238-1239.) Section 10000 imposes a minimum standard of care—one requiring that subsistence medical services be provided promptly and humanely. (48 Cal.App.4th at pp. 1243, 1245.) Counties

retain discretion to determine how to meet this standard, but they may not deny subsistence medical care to residents based upon criteria unrelated to individual residents' financial ability to pay all or part of the actual cost of such care.

We agree with the trial court that the County's contingent eligibility standard does not satisfy its section 17000 obligation, and conclude that the trial court did not abuse its discretion in precluding the County, during the pendency of the action, from implementing any eligibility standard that fails to consider the financial ability of residents to pay actual medical subsistence costs.

### III

The judgment of the Court of Appeal is reversed, and the cause is remanded to that court with directions to deny the peremptory writ and discharge the alternative writ.

Mosk, J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Grignon, J.,* concurred.

---

*Associate Justice of the Court of Appeal, Second District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.